**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re | § | |
| LEASE OIL ANTITRUST | § | MDL No. 1206 |
| LITIGATION | § | |
| (No. II) | § | |

## ORDER

On this day came on to be considered (1) the "Report on Status of Settlement

Administration and Accounting of Settlement Funds, Request for Payment of Additional

Administrative Expenses, and Request for Order Concerning Disposition of Remaining Funds,"

filed by Class Counsel, Susman Godfrey (D.E. 954) ("Class Counsel Report"), and (2) the

"Motion for Reconsideration and Enforcement of Contract," filed by Independent Oil Producers'

Agency ("IOPA") (D.E. 961 & 965) ("Motion for Reconsideration").

## I.    Background

In July 1995, Lee Godfrey of the law firm Susman Godfrey filed a suit in Texas state

court, <u>State of Texas et al. v. Amoco Production Company, et al.</u>, pursuing claims for a putative

class of Texas royalty payees against eight major oil companies, alleging that oil companies had

breached an implied duty under their leases to pay royalty owners the fair market value of their

oil at the well.  The following year, in April 1996, Charles Kipple filed a class action suit against

39 oil companies in federal court on behalf of a putative nationwide class of royalty and working

interest owners, <u>McMahon Foundation et al. v. Amerada Hess Corp., et al.</u>, alleging that those

companies, in violation of § 1 of the Sherman Act, conspired for over a decade to artificially

depress payments made for lease oil to the putative class members.  In November 1997, Godfrey

and Kipple presented a settlement agreement with 24 defendants to the <u>McMahon</u> court.  Before

any ruling on that settlement, the Judicial Panel on Multidistrict Litigation ("JPML") transferred

McMahon and several later-filed federal actions to this Court pursuant to 28 U.S.C. § 1407 for
coordinated and consolidated proceedings as In re Lease Oil Antitrust Litigation, MDL-1206.

On May 14 and 15, 1998, this Court conducted the initial pretrial conference in MDL-
1206.  Godfrey, Kipple, and plaintiffs' counsel in other related state and federal suits, as well as
24 (of the 32 named in the MDL consolidated complaint) defendant oil companies expressed
their desire to pursue the "Global Settlement" that Godfrey and Kipple had presented in the
McMahon court prior to consolidation by the JPML.  This Court divided the parties present into
four groups: Settling Plaintiffs, Settling Defendants, Non-Settling Plaintiffs and Non-Settling
Defendants.

In October 1998, this Court conducted a four-day preliminary fairness hearing.  At the
hearing, the Settling Plaintiffs and Settling Defendants presented testimony from expert
witnesses in support of their respective positions and in support of the Global Settlement.  The
Non-Settling Plaintiffs vigorously cross-examined those experts and presented expert testimony
of their own, arguing that the Global Settlement did not adequately compensate class members
for their antitrust claims.  The Court granted preliminary approval to the Global Settlement and
authorized the sending of notice to the settlement class.

Prior to the deadline for sending notice to the class, counsel for both the Settling
Plaintiffs and the Non-Settling Plaintiffs reached seven distinct settlement agreements with seven
remaining Non-Settling Defendants (the "Stand Alone Settlements").[1]  Since these seven
Defendants represented all of the remaining significant Defendants in the oil industry, the
approval of these Stand Alone Settlements along with the Global Settlement would effectively

---

[1]  The seven remaining Non-Settling Defendants were: Exxon, Koch, Phibro/Basis, Arco,
Mobil, and Apache.

mean the conclusion of the multidistrict litigation.  In December 1998, plaintiffs' counsel presented the Court with the seven Stand Alone Settlements and proposed making a joint mailing of notice to the class members with the Global Settlement since the definitions of the class and the claims released were identical in the Global and the Stand Alone Settlements.  On the understanding that the Stand Alone Settlements would meet parity with the Global Settlement in terms of compensation to class members, the Court granted preliminary approval to those seven additional Settlements.  Further, at the December 1998 hearing, the Court granted preliminary approval to a supplement to the Global Settlement which enhanced the recovery to the class.

The parties sent direct mail notice to the class--persons with over one million unique tax identification numbers--regarding the terms of the eight Settlements and the fairness hearing set for April 5, 1999.  During this five-day fairness hearing, plaintiffs' counsel presented expert witnesses in support of the Settlements and their fee requests.  Objectors were allowed to ask questions of the Court, witnesses, and counsel, and one objector presented testimony of his own.

Based on the record formed at the two fairness hearings and the submissions to the Court, the Court found that the eight Settlement agreements were fair, adequate and reasonable, and gave them final approval.  See In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. 403 (S.D. Tex. 1999).  The Court also awarded reasonable attorneys' fees, noticing and litigation costs, and incentive awards.  See id.

The Court then issued eight separate final judgments, extinguishing any liability of the Settling Defendants with respect to the Settled Claims belonging to the Settlement Class.  (D.E. 595-601, 607.)  Each final judgment also contained the following provision: "This Court shall retain continuing jurisdiction over the Settlement Amount (including the Interim Unclaimed

Fund and the Final Unclaimed Fund), the Settling Parties and the Settlement Class.  This continuing jurisdiction shall include jurisdiction to order injunctive relief for the purposes of enforcing, implementing, administering, construing and interpreting the Settlement Agreement." (D.E. 595-601, 607.)

Susman Godfrey represented First-Tier Royalty Owners during the process of settling Class Member's claims in the McMahon and Exxon settlements.  Once the settlements became final by their terms, Susman Godfrey assumed responsibility for overseeing the administration of seven of the eight settlements ("the Settlements") for all Class Members: First-Tier Royalty Owners, Second-Tier Royalty Owners and Working Interest Owners.[2]

On January 22, 2003, Susman Godfrey filed an update to the Court on the administration of the Settlements, along with a motion to approve payment of administrative expenses as of September 30, 2002.  (D.E. 718.)  The Court granted the motion, approving payment of $2,184,231.60 in administrative expenses.  (D.E. 720.)

On August 21, 2007, Susman Godfrey filed the Class Counsel Report, which is currently pending before the Court.  (D.E. 954.)  Susman Godfrey filed this Report "to inform the Court of the status of the administration of various settlements; to provide an accounting of settlement funds paid during, and remaining after, the distribution process; to ask the Court to approve a final payment of reasonable administrative expenses incurred as part of the distribution process;

---

[2]  Susman Godfrey did not have any role in the administration of the Apache Settlement. Under the terms of that Settlement, Apache--not the class--was responsible for paying the expenses of administration.  According to Susman Godfrey, counsel for the class certified in connection with the Apache Settlement has requested Susman Godfrey to prepare a report on the status of that distribution.  On August 21, 2007, Susman Godfrey stated that it "is still gathering the information necessary for that report, and expects to be able to provide those details shortly." (D.E. 954, at 2 n.1.)  No later than 30 days after the date this Order is filed, Susman Godfrey shall file a report on the status of the distribution of the Apache Settlement.

and to request guidance on what should be done with settlement amounts that remain in the settlement administrator's control."  (D.E. 954, at 1.)

On September 21, 2007, IOPA filed the Motion for Reconsideration, seeking "this Court to reconsider the Claim Administrator's decision denying IOPA's claim ... and to enforce the Settlement Agreement, to grant IOPA's claim, and to remand the claim to the Settlement Administrator to determine the amount that should be paid to IOPA and to pay IOPA the amount of its claim," and for "an award of attorneys' fees in bringing this motion."  (D.E. 961, at 1.)

II.    **Discussion**

A.    **Jurisdiction**

This Court has jurisdiction to consider the issues raised in the Class Counsel Report and the Motion for Reconsideration, and to issue the orders contained herein, pursuant to the explicit retention of jurisdiction in the final judgments, as quoted above.  See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381-382 (1994) (stating a court may retain continuing jurisdiction over a settlement agreement if such intention is written into the court order).

B.    **Class Counsel Report**

The Class Counsel Report is divided into three sections: (1) an update on the administration of the Settlements and an accounting of the remaining funds; (2) a request for reimbursement  of additional administrative expenses; and (3) a request for direction as to the disposition of the remaining funds.

1.    **Status of Settlement Administration and Accounting**

Having reviewed the Class Counsel Report and the attached evidence, and there being no objections filed, the Court finds as follows:

- The Settling Defendants funded the Settlement Amount due under the terms of the Settlements in stages, between November 2001 and January 2002. (D.E. 954-4, Pulliam Aff. ¶ 5, Ex. A.)

- At the time of funding, the total Settlement Amount was $232,746,963. (Id.)

- This Court awarded attorneys' fees and expenses totaling $65,171,723 to be paid from the Settlement Amount, and that amount was in fact paid to the appropriate counsel. (Id. ¶ 6, Ex. A.)

- This Court also approved a reimbursement to Settling Defendants from the Settlement Amount of $9,653,794, for administrative expenses Settling Defendants advanced before the Settlements were funded, and that amount was deducted from the total Settlement Amount and returned to the Settling Defendants. (Id. ¶ 7, Ex. A.)

- Shortly after funding, $190 was transferred from the Apache Settlement account into the account holding the remaining Settlement Amount; this $190 represented the Court-approved incentive awards associated with the Apache Settlement. (Id.)

- After payment of attorneys' fees and expenses, the reimbursement of administration expenses, and the transfer of funds from the Apache Settlement, $157,921,636 was left on deposit in accounts controlled by The Garden City Group, Inc. ("Garden City"), as co-Settlement Administrator.[3] (Id. ¶ 8, Ex. A.)

---

[3]   During the years-long process of Settlement administration, Garden City was responsible for maintaining the bank accounts into which the Settlement Amount was deposited and out of which distributions were made. It also had sole authority to issue checks on those accounts.

The other co-Settlement Administrator, Econ One Research, Inc. ("Econ One"), was tasked with the job of directing Garden City who to pay and in what amounts, consistent with the terms of the Settlements.

- From funding through the date when distributions were calculated, the remaining Settlement Amount earned $455,038 in interest, making the total gross funds available for allocation and distribution to Class Members $158,376,674.  (Id. ¶ 9, Ex. A.)

- From that amount, $2,655,324 was budgeted for total distribution expenses, $167,026 of which was allocated to Mobil for payment in accordance with the terms of the Mobil Settlement,[4] leaving $2,488,298 to be deducted from the amount available to be allocated for distribution to Class members.  (Id. ¶ 10, Ex. A.)

- After the budgeted distribution expenses were set aside, the Net Settlement Fund amounted to $155,888,376; to that amount, an additional $122,079 was allocated after the initial distribution as a result of reconciling data issues and making corrections to the claims administration process, leaving a Net Settlement Fund (after subtracting budgeted expenses and before withholding for taxes) of $156,010,455 for Class Members.  (Id. ¶ 11, Ex. A.)

- The $156,010,455 was allocated as follows: a total of $13,927,021 was set aside to pay severance taxes to various states on behalf of Class Members; $261,073 was set aside to pay federal withholding tax associated with Class Members without known tax identification numbers; $108,630 was distributed to Class Representatives in the form of

---

[4]    The Mobil Settlement as approved required Mobil to pay the expenses of administration.  Mobil chose to participate in the joint administration of settlements that Susman Godfrey oversaw.  Mobil has not yet funded the $167,026 in administration expenses budgeted to it.  As part of the Class Counsel Report, Susman Godfrey moved the Court for an order requiring Mobil to reimburse the Settlement Fund the $167,026 budgeted as Mobil's share of administrative expenses.  This motion was not opposed by Mobil (who was noticed) or any other party.  See S.D. Tex. Local R. 7.4 ("Failure to respond [to a motion] will be taken as a representation of no opposition.").  To the extent it has not already been done, Mobil is hereby ORDERED to reimburse the Net Settlement Fund the amount of $167,026 within 30 days of this Order for its share of the cost of settlement administration.

Court-approved incentive awards; and the remaining $141,713,731 was allocated for distribution to the Class Members.  (Id. ¶ 12, Ex. B.)

- Altogether, during the administration process, over 446,000 checks were issued.  (D.E. 954, at 5.)  As of June 29, 2007, Class Members and taxing authorities had cashed checks totaling $145,859,497 (or 93.5% of the total $156,010,455 allocated to Class Members). (D.E. 954-4, Pulliam Aff. ¶ 15, Ex. D; see also D.E. 954-3, Passarella Aff. ¶ 11, Ex. E.) The balance of the amount allocated to Class Members--$10,167,980 (6.5% of the allocated total)--is made up of payments that were mailed but returned, payments that were mailed but were neither returned nor cashed, payments that were for less than the de minimis amount approved by the Court, and payments that were otherwise undeliverable. (D.E. 954-4, Pulliam Aff. ¶ 16.)

- Settlement co-Administrator Econ One determined how much of the $10,167,980 was allocated to class members who lived in each state.  The results are set forth in Exhibit G to the Pulliam Affidavit.  (D.E. 954-4.)  Class members who reside in Texas were allocated the largest percentage of the remaining funds--approximately 45.6% of the total, or approximately $4,638,286.   Residents of the state of California were allocated the next largest amount--13.2%, or approximately $1,346,019.  Altogether, the remaining $10,167,980 is currently allocated to class members in 45 states and the District of Columbia.  Approximately 1.7% of the remaining Net Settlement Fund (approximately $172,855) is allocated to class members for whom no address was known or for whom the only known address was a foreign country.  (D.E. 954-4, Pulliam Aff. ¶ 21, Ex. G.)

- In addition to the funds remaining that were previously allocated to Class Members, there are two other non-allocated sources of funds remaining in the Settlement Fund.  These include interest earned of $1,090,385 over the amount budgeted and included in the distribution,[5] and budgeted distribution costs of $484,490 that were set aside but have not yet been spent.  (Id. ¶ 17, Ex. E.)  Additionally, the fund has paid $152,498 to Class Members after the initial allocation calculations were made and a net of $54,556 in federal income taxes.  (Id. ¶ 18, Ex. E.)

- At Susman Godfrey's request, co-Settlement Administrator Econ One reviewed the check registers that co-Settlement Administrator Garden City maintained to determine whether the checks Garden City issued were in accordance with the instructions it received from Econ One and the data it was provided.  (D.E. 954-4, Pulliam Aff. ¶ 13, Ex. C.)  Econ One's review of the check registers showed that in fact, checks totaling $156,027,477 were written and distributed to class members and taxing authorities.  (Id.)  That amount is $17,022 more than should have been distributed--or 0.01% of the budgeted allocation. (Id.)  Econ One was able to determine that over 90% of the discrepancy--$15,623--is accounted for by the fact that 12 class members were erroneously issued duplicate checks.  (Id. ¶ 14.)  On balance, the Court finds that this error was relatively small.  The number of duplicate checks written relative to the total number of checks issued is approximately 0.003%.  (Id.)  However, the Court will deduct the full amount of the error--$17,022--from the Settlement Administrators' award of administrative expenses

---

[5] All interest earned on the remaining Net Settlement Fund after the dates reflected in the Class Counsel Report shall continue to be added to the Net Settlement Fund.

(half of the amount—$8,511—shall be deducted from Econ One's award, and the other half shall be deducted from Garden City's award), see infra.

• Finally, in reconciling the expected funds with the bank statements the total dollar amount in the accounts Garden City controls should have been $11,368,774 as of June 29, 2007.  (Id. ¶ 19, Ex. F.)  In fact, the bank statements as of June 29, 2007 show a total of $11,355,821 in the accounts.  (Id. ¶ 20.)  That amount is $12,953 less than the amount Econ One expected to find based on the check registers.  According to the Class Counsel Report: "Econ One has been unable to determine where the discrepancy lies, but has concluded that the check registers are the most likely source of the error, since they record 446,476 checks issued.  In any event, the discrepancy is 0.01% of the total funds that should be remaining, and just 0.008% of the funds deposited with the Garden City Group."  (D.E. 954, at 7 (citing D.E. 954-4, Pulliam Aff. ¶ 20).)  The Court will deduct the full amount of the discrepancy--$12,953—from the Settlement Administrators' award of administrative expenses (half of the amount—$6,476.50—shall be deducted from Econ One's award, and the other half shall be deducted from Garden City's award), see infra.

### 2.    Request for Reimbursement of Administrative Expenses

The Class Counsel Report requests payment for the fees and expenses of Garden City, Econ One and Susman Godfrey during the period from October 1, 2002 through August 21, 2007, and includes an estimate of approximately $17,000 for the remaining tasks necessary to complete and close administration.  As reflected in the Class Counsel Report, all of these fees and expenses were (and the remaining expenses will be) incurred as part of the process of distributing the proceeds of the Settlements to Class Members.  None have been submitted to this

Court for approval prior to the filing of the Class Counsel Report.  Having reviewed the Class Counsel Report and all attachments, and--except as discussed below--there being no objections filed, the Court ORDERS the following:

•  The distribution process and the distributions made pursuant to that process are hereby approved as reasonable and appropriate under the terms of the Settlements, except as discussed below with respect to IOPA's Motion for Reconsideration;

•  The accounting of the Settlement Amount as reflected in the Class Counsel Report and all attachments is hereby approved as reasonable and adequate;

•  Garden City is hereby awarded an additional $351,264.61 from the remaining Settlement Amount for reasonable and previously un-reimbursed fees and expenses incurred in administering the Settlements as co-Settlement Administrator;[6]

•  Econ One is hereby awarded an additional $162,908.79 from the remaining Settlement Amount for reasonable and previously un-reimbursed fees and expenses incurred in administering the Settlements as co-Settlement Administrator;[7]

•  Susman Godfrey is hereby awarded an additional $7,038 from the remaining Settlement Amount for reasonable and previously un-reimbursed out-of-pocket expenses incurred in overseeing Garden City, Econ One, and the administration process.

### 3.    Remaining Claimants

As of June 29, 2007, the accounts in which the Net Settlement Fund are held contained $11,355,821.[8]  (D.E. 954-4, Pulliam Aff. ¶ 20.)  As discussed more fully below, this amount will

---

[6]  This reflects a deduction of $14,987.50 from the amount requested for Garden City, due to the two errors discussed <u>supra</u>.

[7]  This reflects a deduction of $14,987.50 from the amount requested for Econ One, due to the two errors discussed <u>supra</u>.

change based upon the rulings contained in this Order, and as Class Members negotiate the remaining unreturned, uncashed checks which have been mailed to Class Members.

Moreover, based upon the Class Counsel Report and other filings in this litigation, there are three entities which have made, or may make on appeal, claims to a portion of the remaining funds: (a) the IOPA; (b) Chesapeake Exploration Limited Partnership ("Chesapeake"); and (c) the State of Texas.

### a.      IOPA

The first remaining claimant to the Net Settlement Fund is the IOPA, whose claims were denied by the Claim Administrator and who was not permitted to participate as a Class Member. On September 21, 2007, IOPA filed the Motion for Reconsideration, seeking "this Court to reconsider the Claim Administrator's decision denying IOPA's claim ... and to enforce the Settlement Agreement, to grant IOPA's claim, and to remand the claim to the Settlement Administrator to determine the amount that should be paid to IOPA and to pay IOPA the amount of its claim," and for "an award of attorneys' fees in bringing this motion."  (D.E. 961, at 1.)  No response or opposition to the Motion for Reconsideration has been filed;[9] therefore, the Court

---

[8]  As set forth supra, this amount includes, inter alia, interest earned of $1,090,385 over the amount budgeted and included in the distribution, and budgeted distribution costs of $484,490 that were set aside but have not yet been spent.

[9]   In the Class Counsel Report, filed prior to the filing of IOPA's Motion for Reconsideration, Susman Godfrey stated:

> As Susman Godfrey understands it, the IOPA is a trade association of oil producers.  During the settlement process, the IOPA filed one or more claim forms on behalf of some members of the association.  Those claims were rejected by the Claims Administrator and Class Counsel for the Second-Tier Royalty Owners and Working Interest Owners.  Susman Godfrey understands that the claims were rejected, at least in part, because the terms of the Settlements required Second-Tier Royalty Owners and Working Interest Owners to file claims on their own behalf, and to include in that filing specific affirmations of the circumstances surrounding the sales of the oil for which compensation was to be

considers the motion to be unopposed.  See S.D. Tex. Local R. 7.4 ("Failure to respond [to a motion] will be taken as a representation of no opposition.").

Although the Motion for Reconsideration does not specify the amount of IOPA's claim, in response to the Class Counsel Report, IOPA filed a document indicating that its claim totals $1,573,580, plus an attorneys' fee claim of $75,000 for breach of contract.  (D.E. 956.)

### i.       Background

IOPA is a California corporation, which was incorporated in 1904, by a group of small oil producers.  (D.E. 961-3, Clark Decl. ¶ 2.)  These producers formed IOPA because their production was small, and, individually, they were unable to obtain even the posted prices paid to larger producers.  (Id.)  Members of IOPA are all working interest owners who operate oil wells, own stock in IOPA, and participate in its management.  (Id. ¶¶ 2-3.)  IOPA's shareholders must operate oil or gas wells, and they must enter into a binding and enforceable contract with IOPA for the marketing of petroleum produced on lands described in their contracts, or they must be the legal representative of a person or entity who produces oil or gas and has entered into a binding contract with IOPA for marketing the petroleum they produce.  (Id. ¶ 3.)  In short,

---

received.  Since the Class Members did not themselves file their claims or make the required affirmation, the Claims Administrator and counsel for the Second-Tier Royalty Owners and Working Interest Owners determined that the claims should not be paid.

(D.E. 954, at 13-14.)  Susman Godfrey also stated that "[w]hile Susman Godfrey played no role in the decision to deny the IOPA claim, Susman Godfrey agrees with the decision based on the facts as it currently understands them."  (D.E. 954, at 14 n.11.)

After IOPA filed its Motion for Reconsideration, supported by over 700 pages of affidavits and exhibits, IOPA filed a "Supplemental Certificate of Conference," indicating that Susman Godfrey "could not at this time take a position one way or another as to whether IOPA's motion should be granted or denied."  (D.E. 962, at 1-2.)  As of the date of this Order, Susman Godfrey has not filed a response or opposition to the Motion for Reconsideration.

at all relevant times to this litigation, all of the members of IOPA are its shareholders and all of the shareholders are oil producers–-more specifically, working interest owners.

IOPA enters into sale contracts with each of its members under which the members sell the oil at the lease subject to the contract to IOPA.  (Id. ¶¶ 3 & 5.)  During the time relevant to this litigation, IOPA contracted with Chevron U.S.A., Inc. ("Chevron") and Union Oil Company of California ("Unocal") to sell the crude oil it purchased from its members to those companies. (Id. ¶ 8.)  All of the crude oil which IOPA sold to Unocal and Chevron came from wells located in the United States.  (Id.)

Each sale contract IOPA has with its members requires the member to sell 100% of the crude oil produced on the lease which is subject to the contract to IOPA, with only two exceptions: (1) crude oil required for use as fuel at the lease and (2) crude oil which the member may have to deliver as royalty to the lessor, if the lessor has not joined in execution of the sale contract with IOPA.[10]  (Id. ¶ 5.)  During the time relevant to this litigation, the contracts required IOPA to pay each member the higher of the arithmetical average of prices posted by Chevron, Unocal, and a couple of other oil companies or Unocal's own posted price in effect on the date of delivery for crude oil of like gravity at the well in the field where such oil was produced.  (Id.) Delivery of the crude oil occurred at the lease, and payment was based upon the number of

---

[10]   According to IOPA, IOPA's members are required to enter into contracts to sell all of their crude oil subject to the contracts to IOPA to protect IOPA from disruption by the large oil companies.  (D.E. 961-3, Clark Decl. ¶ 7.)  The large oil companies had frustrated earlier efforts by the small operators to sell their oil as a group by offering one or two members of the group premium prices to sell their oil separately from the group.  (Id.)  That left the rest of the group members unable to get posted prices.  (Id.)  Once the group had been successfully broken up, the favored members no longer could get posted prices either.  (Id.)  When IOPA was organized, the members agreed that all members would have to contract to sell their oil to IOPA, which would in turn sell to the oil companies, to prevent use of this tactic by oil companies.  (Id.)

barrels delivered at the lease.  (Id. ¶ 6.)  The sale contracts provided that title to the crude oil would pass to IOPA when it was delivered into the truck or pipeline.  (Id.)

Under IOPA's contracts with Unocal and Chevron, the two oil companies purchased IOPA's crude oil at their posted prices for the oil at the leases, plus an administrative fee.[11]  (Id. ¶ 8.)  During the time covered by the settlement of this litigation, the administrative fee was $.20 per barrel.  (Id.)  The posted prices were expressed as a specific amount of money per barrel of oil purchased at the lease.  (Id. ¶ 2.)  The oil companies collected the oil at the leases of the individual members of IOPA.  (Id. ¶ 8.)  When Chevron or Unocal took possession of the oil at the leases, title to the oil passed to Chevron or Unocal.  (Id.)  Essentially, title to the crude oil passed from the member to IOPA and from IOPA to Chevron or Unocal almost simultaneously.  (Id.)  Although IOPA purchased oil from its members, it never took possession of the oil; possession always passed directly from the member to Chevron or Unocal.  (Id.)

According to IOPA, "[i]f the members of IOPA had not organized, they would not have had the market power to sell their oil at even the posted prices, much less the prices that plaintiffs in this case alleged should have been paid.  The posted prices at which IOPA sold its oil to Unocal and Chevron were the same posted prices of which plaintiffs complained in this lawsuit.  It is those same prices upon which IOPA based its payments to its members."  (D.E. 961, at 11-12 (citing D.E. 961-3, Clark Decl. ¶ 9).)

### ii.    Procedural History

As set out above, after the Settlements received preliminary approval from this Court, a "Notice of Class Action and Proposed Settlement" ("Notice"), was sent to potential class members.  Pursuant to the Notice, working interest owners were required to submit claims by

---

[11]  The administrative fee provides the funds upon which IOPA operates.  (Id. ¶ 8.)

March 5, 1999.  The Notice was directed to "all persons and entities who received payments from defendants between January 1, 1986 and September 30, 1998 that were either (a) payments directly attributable to ... working interests or other similar interests in the production of Domestic Crude Oil, or (b) payments for Lease Purchases of Domestic Crude Oil."  (D.E. 338, Order No. 57, Ex. 1.)

Between January 1, 1986 and September 30, 1998, IOPA sold 14,960,355 barrels of crude oil to Chevron.  (D.E. 961-3, Belt Decl. ¶ 4.)  Between January 1, 1986 and March 31, 1997, IOPA sold 28,477,214 barrels of crude oil to Unocal.[12]  (Id.)  IOPA's wholly owned subsidiary, Independent Oil Producers' Services Co., Inc. ("IOPA Service Co."), sold crude oil to one of the Defendants during the relevant time.  (Id.)  In accordance with the Notice, IOPA and IOPA Service Co. submitted their claims by March 5, 1999.  (Id. ¶ 5.)

In August 1999, IOPA received a letter from the Claim Administrator informing it that there was a discrepancy between the number of barrels that IOPA claimed to have sold to Chevron and Unocal in the McMahon Settlement and the number of barrels which the oil companies reported having purchased from IOPA under IOPA's tax identification number reported on IOPA's claim form.  (Id. ¶ 6, Ex. C.)  According to the letter, IOPA was required to submit additional original documents in support of its claim by August 16, 1999.  (Id.)  On August 13, 1999, IOPA submitted annual sale confirmation letters executed by Unocal and by Chevron confirming the amount of oil each company purchased from IOPA during each month

---

[12]   As discussed infra, Unocal is a Settling Defendant only for purchases of Domestic Crude Oil from January 1, 1986 through September 30, 1997.  (D.E. 136, Global Settlement Agreement ¶¶ 1.4, 1.4A & 1.5, and Revised Ex. H-6.)

of the preceding calendar year.[13]  (Id. ¶¶ 6-8, Ex. D.)  IOPA submitted these sale confirmation letters for each year from each company to substantiate the amount claimed on the Table of Information on the claim form.  (D.E. 961-3, Belt Decl. ¶ 8.)  These letters, which included a signature from the oil companies verifying the amount of oil sold to them each month, confirmed the amounts claimed by IOPA in the Table of Information in its original claim.  (Id.; Exs. B & D.)  IOPA asked the Claim Administrator to notify IOPA if more information was required. (D.E. 961-3, Belt Decl. ¶ 8, Ex. D.)  The Claim Administrator did not request additional information from IOPA.  (D.E. 961-3, Belt Decl. ¶ 8.)  IOPA Service Co. received a similar letter from the Claim Administrator requesting additional documentation to substantiate the amount of crude oil it claimed to have sold, and IOPA Service Co. also submitted annual confirmation letters to substantiate the amount of its claim.  (D.E. 961-3, Belt Decl. ¶¶ 6 & 8.)

Neither IOPA nor IOPA Service Co. heard anything further about their claims until March 2002, when IOPA Service Co. received payment of its claim.  (Id. ¶ 9.)  IOPA received no word on its claim.  (Id.)  After IOPA made inquires, IOPA learned that its claim had been denied.  (Id.)  IOPA has never received a formal written denial of its claim from the Claim Administrator or a formal written explanation of the reasons for denial.

---

[13]     According to IOPA, IOPA goes through a rigorous, independent audit by an independent auditor every year to confirm that it has properly accounted for all sales of oil to the oil companies and has properly compensated all of its members for the oil sold from their leases. (D.E. 961-3, Belt Decl. ¶ 7; D.E. 961-4, Judd Decl. ¶ 2.)  As part of that annual audit, the auditor sent Chevron and Unocal annual sale confirmation letters.  (D.E. 961-3, Belt Decl. ¶ 7; D.E. 961-4, Judd Decl. ¶ 2.)  Each letter listed the amount of oil IOPA had purchased from the company to which the letter was addressed for each month of the preceding calendar year, the amount paid for the oil each month, and the amount paid to IOPA for its service charge each month.  (D.E. 961-3, Belt Decl. ¶ 7.)  Each company was asked to confirm the amounts listed or to note any discrepancies.  (Id.)  Each year, Chevron and Unocal signed and returned the sale confirmation letters.  (Id.)  Most letters reflect that the oil companies' records confirmed IOPA's records, but when the records differed, the companies noted the discrepancies on the confirmation letter before returning it.  (Id.)  IOPA was always able to reconcile the differences.  (Id.)

### iii.  Analysis

The Global Settlement Agreement provides that the "Settlement Administrator" shall pay claims of "Settling Defendant Payees."  (D.E. 136, Global Settlement Agreement ¶¶ 2.4(a) & 2.5.)  The Global Settlement Agreement defines a "Settling Defendant Payee" as, "any Class Member with ... a Working Interest Claim ... against a Settling Defendant, but solely in his capacity as owner of such claims."  (Id. ¶ 1.41.)  In short, to be entitled to payment under the Global Settlement Agreement, IOPA must demonstrate that it is (a) a "Class Member" with (b) a "Working Interest Claim" against a "Settling Defendant."

### a.        "Class Member"

According to the Global Settlement Agreement, "Class Members" are defined as, inter alia, "all persons and entities who received payments from Defendants between January 1, 1986 and September 30, 1998, that were either (a) payments directly related to ... working interests or similar interests in the production of Domestic Crude Oil, or (b) payments for Lease Purchases of Domestic Crude Oil."  (Id. ¶ 1.14(a).)[14]

As an initial matter, "Domestic Crude Oil" is defined as "crude oil and condensate produced in the United States."  (Id. ¶ 1.11.)  Chevron is a "Settling Defendant." (Id. ¶ 1.4, and Revised Ex. H-6.)  Unocal is a "Settling Defendant" for purchases of "Domestic Crude Oil" from January 1, 1986 through September 30, 1997, and a "Non-Settling Defendant" for purchases of "Domestic Crude Oil" from October 1, 1997 through September 30, 1998.  (D.E. 136, Global Settlement Agreement ¶¶  1.4, 1.4A & 1.5, and Revised Ex. H-6.)

Applying these definitions to the evidence, IOPA has demonstrated that it is a "Class Member."  A person or entity may be a "Class Member" in one of two ways.  First, "Class

---

[14]  There are six exceptions to this definition, which are discussed infra.

Members" are all persons and entities who received payments from Defendants during the specified time period that were payments directly related to working interests or similar interests in the production of "Domestic Crude Oil." As set forth above, all members of IOPA were working interest owners. IOPA purchased their crude oil and sold it to either Chevron or Unocal, two of the "Settling Defendants" in this litigation. As set out above, the oil IOPA sold to Chevron and Unocal was produced in the United States and therefore constitutes "Domestic Crude Oil." Accordingly, IOPA satisfies the first definition of "Class Member."

Although it was not necessary, IOPA has also demonstrated that it satisfies the second definition of a "Class Member," which provides that "Class Members" are all persons and entities who received payments from Defendants during the specified time period which were payments for "Lease Purchases" of "Domestic Crude Oil." (D.E. 136, Global Settlement Agreement ¶ 1.14(a).) A "Lease Purchase" is defined as "any transfer of title of Domestic Crude Oil accounted for as a transfer at the lease. This includes purchases of Domestic Crude Oil, either at the well head, in the field where produced or at an off-site processing or treatment facility, when those categories of purchases are accounted for as purchases at the lease." (Id. ¶ 1.12.) As set forth above, IOPA's sales of crude oil to Defendants were accounted for as a transfer of title at the lease. Title to the crude oil sold by IOPA transferred from IOPA to Defendants at the lease, and Defendants paid IOPA their posted prices for the purchase of crude oil at the lease, plus the service charge described above. Finally, all of the crude oil sold by IOPA was "Domestic Crude Oil," because it was produced in the United States. Therefore, the payments that IOPA received from Unocal and Chevron were payments for "Lease Purchases" of "Domestic Crude Oil," and IOPA thus satisfies the second definition of a "Class Member."

Finally, the exceptions to the definition of "Class Members" are: "(1) Settling Defendants and Released Parties, (2) Non-Settling Defendants and their Affiliates, (3) the plaintiffs in consolidated Cause No. C-2016-95-G in the 370th Judicial District Court in Hidalgo County, Texas, (4) the United States and its instrumentalities and agencies (including without limitation, the Minerals Management Service), and Indian tribes, (5) government entities (other than Local Public Interest Holders), and (6) working interest owners, solely in their capacity as working interest owners, who engaged in by/sell or exchange agreements with any Defendant or its Affiliates based upon posted prices." (D.E. 136, Global Settlement Agreement ¶ 1.14(b).) During the relevant times, IOPA only sold oil to Unocal and Chevron. Neither Chevron nor Unocal were members of IOPA, and IOPA had no exchange or buy/sell relationships with Unocal, Chevron or any other Defendant or their Affiliates. (D.E. 961-3, Ex. B.) In short, none of the exceptions to the definition of "Class Members" applies to IOPA. Therefore, IOPA has demonstrated that it qualifies as a "Class Member."

### b.    "Working Interest Claim"

As set out above, to be a "Settling Defendant Payee," IOPA must not only be a "Class Member," but must also have a "Working Interest Claim" against a "Settling Defendant." A "Working Interest Claim" is defined as "a Class Member's Settled Claim against a Settling Defendant arising from a payment made directly to that Class Member by that Settling Defendant ... with respect to a working interest, including a direct payment attributable ... a Lease Purchase of that Class Member's working interest in Domestic Crude Oil." (D.E. 136, Global Settlement Agreement ¶ 1.39.) The definitions of "Lease Purchase," "Domestic Crude Oil," and "Class Member" have been discussed above, as has the fact that Chevron and Unocal

are "Settling Defendants" with respect to the purchases at issue from IOPA.  The remaining issue is whether IOPA has a "Settled Claim" against Unocal and Chevron, for payments they made directly to IOPA with respect to working interests.

"Settled Claims" are defined as, "all claims, causes of action and liabilities of whatever nature or origin, known or unknown, that have been or could be asserted against Settling Defendants (including but not limited to contract claims, tort claims, and claims arising under state or federal statute, regulation or antitrust law) and that are based upon a Per-Barrel Valuation used by a Defendant in making payments between January 1, 1986 and September 30, 1998 to a Class Member for (a) ... working interests, or other similar interests in the production of Domestic Crude Oil or (b) Lease Purchases of Domestic Crude Oil."  (Id. ¶ 1.15.)  The Global Settlement Agreement goes on to explain, by way of example, that "Settled Claims" include "claims that payments to Class Members based on a Per-Barrel Valuation would have been higher in the absence of conspiracies and other wrongful acts to lower prices."  (Id.)  Finally, "Per-Barrel Valuation" means, "the dollars-and-cents amount paid by a Defendant to a Class Member with respect to a given barrel of Domestic Crude Oil.  This includes the use of posted prices or any other per-barrel value basis."  (Id. ¶ 1.13.)

IOPA has demonstrated that its claims are "Settled Claims," as defined in the Global Settlement Agreement.  Chevron paid IOPA for Domestic Crude Oil delivered to it at IOPA's members' leases between January 1, 1986 and September 30, 1998.  Unocal paid IOPA for Domestic Crude Oil delivered to Unocal at IOPA's member's leases from January 1, 1986 to March 31, 1997.[15]  Unocal's and Chevron's payments were the total of their posted prices for

---

[15]  IOPA's claim with respect to purchases by Unocal does not include the period from October 1, 1997 through September 30, 1998, during which time Unocal was a Non-Settling Defendant.

purchases of crude oil at the leases, plus a $.20 per barrel service fee to IOPA.  The posted prices were expressed in terms of a particular amount of money per barrel and were therefore based upon a "Per-Barrel Valuation."  Finally, the payments made by Unocal and Chevron were payments made for working interests owned by IOPA's members and, as has already been demonstrated above in discussing IOPA's status as a "Class Member," the payments were made for "Lease Purchases" of "Domestic Crude Oil," as those terms are defined in the Global Settlement Agreement.

In summary, to be a "Working Interest Claim," IOPA's Settled Claims against a Settling Defendant must arise "from a payment made directly to [that] Class Member [i.e., IOPA] by that Settling Defendant [i.e., Chevron and Unocal] ... with respect to a working interest...."  (Id. ¶ 1.39.)  IOPA has shown that two Defendants, Unocal and Chevron, made payments directly to IOPA with respect to its members' working interests.  Accordingly, IOPA has shown that it is a "Class Member" with a "Working Interest Claim" against a "Settling Defendant," and IOPA therefore is a "Settling Defendant Payee" to whom a portion of the Settlement should have been paid.  (Id. ¶¶ 1.41, 2.4(a) & 2.5.)

### c.      Remand

For the reasons set out above, the Court finds that IOPA is a "Settling Defendant Payee" whose claim should be paid under the provisions of the Global Settlement Agreement. Therefore, the Motion for Reconsideration (D.E. 961 & 965) is GRANTED.  IOPA's claim is hereby REMANDED to the Settlement Administrator.  No later than 30 days from the date this Order is filed, the Settlement Administrator is ORDERED to (1) pay IOPA the amount of IOPA's claim which the Settlement Administrator or its designee determines has been properly

substantiated by IOPA, and (2) file with the Court a report indicating what was paid to IOPA, and, if this amount is less than the full amount of IOPA's claim, a statement of the reason(s) the claim was not paid in full.[16]  No later than 20 days after the Settlement Administrator files this report, IOPA may file a response.  If IOPA continues to seek attorneys' fees and expenses for bringing the Motion for Reconsideration, IOPA shall support its request with authority and evidence in its response to the Settlement Administrator's report.

### b.        Chesapeake

The second of the three entities which have made, or will likely make on appeal, claims to a portion of the remaining funds is Chesapeake.

Under the terms of each Settlement, Chesapeake was classified as a Non-Settling Defendant and therefore excluded from participation in the Settlements as a Class Member. Chesapeake objected to its exclusion by motion with this Court; on May 10, 1999, this Court approved the Settlements over these objections.  See In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. 403, 450 (S.D. Tex. 1999).  As discussed above, the Court then issued eight separate final judgments, extinguishing any liability of the Settling Defendants with respect to the Settled Claims belonging to the Settlement Class.  As set forth above, each final judgment also contained the following provision: "This Court shall retain continuing jurisdiction over the Settlement Amount (including the Interim Unclaimed Fund and the Final Unclaimed Fund), the Settling Parties and the Settlement Class.  This continuing jurisdiction shall include jurisdiction to order injunctive relief for the purposes of enforcing, implementing, administering, construing and interpreting the Settlement Agreement."  (D.E. 595-601, 607.)

---

[16]  For the purposes of this Order, when the Court orders the "Settlement Administrator" to take an action, Garden City, Econ One and/or Susman Godfrey may take the required action, depending upon which entity is most appropriate for the task.

On May 13, 1999, Chesapeake appealed the Court's May 10, 1999 Order approving the Settlements.  (D.E. 524.)  Chesapeake voluntarily abandoned this appeal.  See McMahon Found. v. Chesapeake Exploration Ltd. P'ship, 98 Fed. Appx. 267, 269 & n.2, 2004 WL 363137, at *1 (5th Cir., Feb. 18, 2004) (noting that "[a]s a result [of Chesapeake's abandonment of its appeal], the fairness of the settlement is no longer an issue [Chesapeake] can raise on appeal").

On July 12, 2002, Chesapeake filed a "Motion to Enforce Settlement Agreement," seeking a settlement disbursement on behalf of three newly-acquired subsidiaries.  (D.E. 693.)  On December 4, 2002, this Court denied the Motion (D.E. 713), and Chesapeake subsequently appealed this denial.  On February 18, 2004, the Fifth Circuit dismissed the appeal on jurisdictional grounds, ruling that Chesapeake's appeal was premature.  See McMahon Found., 98 Fed. Appx. at 271, 2004 WL 363137, at *2.  The Fifth Circuit explained that this Court's Order denying the "Motion to Enforce Settlement Agreement" was an "order interpreting th[e] settlement to determine the rights and liabilities of one party."  Id., 98 Fed. Appx. at 270, 2004 WL 363137, at *2.  According to the Fifth Circuit, "[s]o long as the [district] court retains its residual grant of jurisdiction further to enforce, administer, and interpret the settlement agreement, any action it takes in this capacity lacks the attribute of finality that is necessary to make the order immediately appealable."  Id., 98 Fed. Appx. at 271, 2004 WL 363137, at *2.

In response to the Class Counsel Report, Chesapeake filed a document stating that Chesapeake intends to pursue its appeal of this Court's prior Orders, and Chesapeake moves this Court to allocate $378,833.88 to be withheld pending resolution of Chesapeake's appeal.[17]  (D.E. 955.)  This motion is GRANTED.  The Settlement Administrator is hereby ORDERED to set

---

[17]  Specifically, Chesapeake claims to be entitled to $228,833.88 as a Class Member, and estimates that it will be entitled to an award of $150,000 in past and future attorneys' fees and costs associated with this matter.  (D.E. 955, at 1-2.)

aside from the remaining Settlement Amount, in an interest earning account, a total of

$378,833.88 until such time as any and all appeals in this litigation involving Chesapeake have

been fully resolved and the results have been reported to this Court.[18]  If Chesapeake appeals and

does not prevail, or if Chesapeake fails to appeal, the funds which have been set aside pursuant

to this Order shall revert into the Final Unclaimed Fund without further order of the Court.[19]

      Finally, it is worth noting that due to this Court's ruling on IOPA's Motion for

Reconsideration, which remands IOPA's claim to the Settlement Administrator, this Court must

continue to retain jurisdiction to "enforce, administer, and interpret the settlement agreement."

As the Fifth Circuit stated, "[a]mong the consequences for [Chesapeake]'s decision to pursue its

claim in th[e] fashion [chosen by Chesapeake] is the subordination of its interests to the larger

action pending in the district court, which retained jurisdiction over the settled case for the

purpose of 'enforcing, implementing, administering, construing and interpreting' the settlement."

McMahon Found., 98 Fed. Appx. at 271, 2004 WL 363137, at *2.  In its order, the Fifth Circuit

listed "several alternative means by which [Chesapeake] could have brought this claim that

would have lent themselves to a quicker appeal."  Id., 98 Fed. Appx. at 271 n.6, 2004 WL

363137, at *2 n.6 (noting that one of these alternatives may still remain open to Chesapeake).

---

[18]   Anytime the Court orders funds to be set aside in an interest earning account, that account shall be devoted solely to those funds, and not to any other funds which are set aside elsewhere in this Order.

[19]   As used in this Order, "Final Unclaimed Fund" refers to the account(s) in which all remaining Settlement funds are located which have not otherwise been set aside by order of the Court.  Based upon the Class Counsel Report, this is currently denominated the "Net Settlement Fund."  (See D.E. 954, at 11; see also D.E. 136, Global Settlement Agreement ¶ 1.36 (defining "Net Settlement Fund").)  By the terms of the Global Settlement Agreement, by the time any appeal is completed, this fund should be denominated "Final Unclaimed Fund."  (See D.E. 136, Global Settlement Agreement ¶ 1.56.)  For the purposes of this Order, the Court uses these terms interchangeably.  All funds distributed via the doctrine of cy pres, see infra, shall be taken from this account(s).

Instead, it appears that Chesapeake has chosen to "wait until the district court completes its task as an administrator of the fund, and appeal the order at that time." Id.

### c.    Texas' Unclaimed Property Fund

The last of the three entities which have made, or will likely make on appeal, claims to a portion of the remaining funds is the State of Texas.

As stated in the Class Counsel Report, "there is a substantial chance that the State of Texas will contest [this Court's] disposition [of the remaining funds], on the theory that at least as to the approximately $4,638,286 currently allocated to class members with a last-known Texas address, the money should be turned over to the State's Unclaimed Property Fund." (D.E. 954, at 15 n.12.)

The Texas Property Code prescribes a mandatory procedure whereby persons or entities holding property rightfully belonging to another, but which has been deemed abandoned property, must turn that abandoned property over to the State of Texas' Unclaimed Property Fund for safekeeping. See Tex. Prop. Code §§ 74.301-74.309. In State v. Snell, the Texas Court of Appeals held that a trial court violated these Property Code provisions when the trial court approved an "unclaimed property provision" in a class action settlement agreement which required the unclaimed funds to be transferred to a charity of the trial court's selection.[20] See State v. Snell, 950 S.W.2d 108, 112-13 (Tex. App.-El Paso 1997).

---

[20]   Even if the Texas Property Code were to apply to the unclaimed funds in this federal class action litigation, Snell is distinguishable from the instant litigation, because in Snell, a contract between the parties (i.e., the settlement agreement) provided that the unclaimed funds were to be distributed to charity, while in this litigation, the Settlement Agreements simply provide that if unclaimed funds exist, "the Settling Parties shall apply to the District Court for directions as to its disposition." (D.E. 136, Global Settlement Agreement ¶ 1.56.) Therefore, despite the broad language of Snell, the Settlement Agreements in this litigation do not appear to run afoul of the Texas Property Code provision which prohibits "private escheat agreements." See Tex. Prop. Code § 74.309 ("An individual, corporation, business association, or other

However, this Court holds that the disposition of unclaimed funds in a class action settlement in federal court is a procedural matter committed to the discretion of the district court under Federal Rule of Civil Procedure 23, and thus is unconstrained by state unclaimed property laws.[21] Rule 23 governs practice and procedure in federal court class actions.  Among other provisions, Rule 23(d) gives the district court powers to make orders relating to procedural matters in a class action, and Rule 23(e) provides that any settlement of a class action must be approved by the district court.  Specifically, Rule 23 grants the district courts discretion to determine whether a proposed settlement is "fair, adequate, and reasonable."  Fed. R. Civ. P. 23(e); see also Parker v. Anderson, 667 F.2d 1204, 1208-09 (5th Cir. 1982); Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977).

In Wilson v. Southwest Airlines, Inc., 880 F.2d 807 (5th Cir. 1989), the defendant, in connection with the settlement of a nationwide class action, created a $1 million fund to provide backpay to members of the plaintiff class.  See id. at 809.  The settlement agreement expressly left the disposition of any unclaimed funds to the court's discretion.  See id. at 810.  After all of the claims submitted by class members were fully paid, over half of the initial fund remained unclaimed.  See id.  The defendant and class counsel each submitted claims for this entire

---

organization may not act through ... private agreement, or any other means to take or divert funds or personal property into income, divide funds or personal property among locatable patrons or stockholders, or divert funds or personal property by any other method for the purpose of circumventing the unclaimed property process.").

[21]   The Fifth Circuit has expressly reserved judgment on this issue.  See Paterson v. Texas, 308 F.3d 448, 450-51 (5th Cir. 2002) (holding that the State of Texas lacked standing to object to the settlement, because the State could only speculate as to which members of the class, if any, would fail to claim their payments, and the State had no standing to represent the interests of the class members).

amount, but the district court instead ordered a cy pres distribution to a charity.[22]  See id.  While

appeal of that decision was pending, the defendant and class counsel resolved their differences,

worked out an agreement to divide the funds between themselves, and presented the revised

settlement to the Court of Appeals.  See id. at 811.  The Fifth Circuit approved the revised

settlement of the parties.  See id. at 815-18.  In doing so, the Fifth Circuit treated the disposition

of unclaimed funds as a matter committed to the discretion of the court under Rule 23.  It began

its analysis by observing that "[a]t the heart of this case is the question whether the trial court

abused its discretion in awarding the remainder of the back-pay fund to [a charity] under the cy-

pres doctrine."  Id. at 811.  The Fifth Circuit examined the arguments for and against the claims

of class counsel, the defendant, and the charity, ultimately deciding against the charity.  See id. at

811-18.  But the Fifth Circuit nowhere mentioned the law of escheat or unclaimed property, or

any other source of state law.  Rather, the Fifth Circuit evaluated the revised settlement in the

exercise of its equitable discretion and its responsibility under Rule 23 to determine whether the

proposed settlement was "fair, reasonable, and adequate."  See id. at 816 ("Suffice it to say that

in our view the settlement is fair, reasonable, and adequate, because it provides for transfer of the

balance of the fund to the only parties with equitable rights in it and in proportion to the relative

equitable interests of those parties.") (citation omitted).

 Just as the Fifth Circuit did in Wilson, other federal courts have treated the issue of the

disposition of unclaimed funds in class actions as a matter of judicial administration, committed

to the discretion of the district court under Rule 23 and unconstrained by state law.  See Van

Gemert v. Boeing Co., 739 F.2d 730, 737 (2d Cir. 1984) (rejecting claim from the State of New

York, which was "[p]resumably" planning to "assert claims under state abandoned property

---

[22]  The cy-pres doctrine is explained infra.

laws," and affirming an order providing for the return of all unclaimed funds to the defendant: "[T]rial courts are given broad discretionary powers in shaping equitable decrees.... [T]his principle should apply to equitable decrees involving the distribution of any unclaimed class action fund."); see also Powell v. Georgia-Pacific Corp., 119 F.3d 703, 706-07 (8th Cir. 1997) (affirming the district court's cy pres distribution of unclaimed funds to a charitable organization, without reference to state law, treating the disposition as a discretionary function of the district court in "administering a settlement" in a large class action); Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1307 (9th Cir. 1990) (reversing the award of residue to a charity while reaffirming the principle that "[f]ederal courts have broad discretionary power in shaping equitable decrees for distributing unclaimed class action funds"); In re Motorsports Merch. Antitrust Litig., 160 F. Supp. 2d 1392, 1393-99 (N.D. Ga. 2001) (surveying the "fairly extensive body of caselaw" regarding distribution of unclaimed funds, none of which references state law, and approving cy pres distributions to several charities); Shaw v. Toshiba Am. Info. Sys., Inc., 91 F. Supp. 2d 942, 981 (E.D. Tex. 2000) (creating a charity with the unclaimed funds in a $2.1 billion settlement of nationwide class action).

If Rule 23 governs the disposition of unclaimed funds in federal court class actions, as appears to have been the assumption in the above-cited cases, then state law has no application. See Hanna v. Plumer, 380 U.S. 460, 471 (1965) (holding that if a valid Federal Rule of Civil Procedure speaks to the issue, then the Rule controls in federal court, to the exclusion of state law) ("When a situation is covered by one of the Federal Rule ... the court [must] apply the Federal Rule, and can refuse to do so only if the Advisory Committee, this Court and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the

Enabling Act nor constitutional restrictions."); Exxon Corp. v. Burglin, 42 F.3d 948, 950 (5th

Cir. 1995) ("If the [Federal] Rule speaks to the point in dispute and is valid, it is controlling, and

no regard need be paid to contrary state provisions.").[23]

Moreover, even if Rule 23 did not apply to the disposition of unclaimed funds in class

actions in federal court, state unclaimed property laws nonetheless would not govern.  In

situations in which no federal rule applies, the determination of whether the issue in dispute is

"substantive" (and therefore governed by state law) or "procedural" (and therefore governed by

federal law) must be made by considering "the twin aims of the Erie[R.R. Co. v. Tompkins, 304

U.S. 64 (1938)] rule: discouragement of forum shopping and avoidance of inequitable

administration of the laws."  Hanna, 380 U.S. at 468; see also Mills v. Davis Oil Co., 11 F.3d

1298, 1304 (5th Cir. 1994) (quoting Hanna); Carter v. General Motors Corp., 983 F.2d 40, 43

(5th Cir. 1993) (same).  If application of federal law would neither encourage forum shopping

nor produce inequity, then the issue is procedural and is governed by federal law, to the

exclusion of state law.  See Mills, 11 F.3d at 1304; Carter, 983 F.2d at 43-44.

There is no reason to believe that entrusting the disposition of unclaimed funds in a class

action to the discretion of the district courts would encourage forum shopping.  At the outset of

litigation, neither the named plaintiffs nor their counsel are likely to be concerned with the rules

that will apply (a) if the litigation is ultimately successful, and then, (b) if and when some class

---

[23]   Once it is established that Rule 23 grants this Court discretion to distribute the
unclaimed funds in this class action settlement, the only remaining issue under Hanna is whether
such application of Rule 23 is invalid under either the United States Constitution or the Rules
Enabling Act, 28 U.S.C. § 2072.  See Burlington N. R.R. Co. v. Woods, 480 U.S. 1, 5 (1987);
Hanna, 380 U.S. at 471.  "[A]ll federal rules of court enjoy presumptive validity.  Indeed, to date
the Supreme Court has never squarely held a provision of the civil rules to be invalid on its face
or as applied."  Exxon Corp. v. Burglin, 42 F.3d 948, 950 (5th Cir. 1995) (quotation omitted).
This Court finds that this application of Rule 23 is valid under the Constitution and the Rules
Enabling Act.

members fail to submit claims or cash checks to share in the recovery.  Cf. Herbert v. Wal-Mart Stores, 911 F.2d 1044, 1047 (5th Cir. 1990) ("The applicability of the uncalled-witness rule is a procedural matter, hence governed by federal law.  With respect to forum shopping, it is difficult to conceive of a situation in which the availability of the rule would affect the choice to sue in or remove an action to federal court, as the party invoking the rule will know only well into the course of the litigation--often not until the close of her opponent's case--that a material witness has not been called."); Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc., 848 F.2d 613, 624 (5th Cir. 1988) ("Any differences in postjudgment interest rates or rules of accrual do not furnish any greater incentive to use the courts of the United States than most of the other procedural features which are unique to the federal forum.").

Nor is there any reason to conclude that different rules regarding the disposition of unclaimed funds will result in the "inequitable administration of the laws."  Hanna, 380 U.S. at 468; see also id. at 467 ("The Erie rule is rooted in part in a realization that it would be unfair for the character or result of a litigation materially to differ because the suit had been brought in a federal court.").  The conflict between state unclaimed property statutes and the federal rule granting district courts discretion to dispose of unclaimed funds does not involve the core rules of decision, such as the elements of the claims, the elements of the defenses, or the measure of relief available to class members.  Cf. Herbert, 911 F.2d at 1047-48 (stating that the uncalled witness rule does not implicate inequity concerns under Erie, in part because it is not "bound up with the definition of the rights and obligations of the parties under state law" or "related to the elements of a state law claim or defense").

Moreover, the federal rule promotes fair and uniform treatment to all members of the class.  By contrast, if state unclaimed property laws were to apply, litigants in nationwide class actions in federal courts, such as this one, would find any unclaimed funds subject to the varying unclaimed property schemes of all 50 states.  Compare, e.g., Tex. Prop. Code § 74.301-74.309 (unclaimed funds must be turned over to the State of Texas' Unclaimed Property Fund), with Cal. Civ. Proc. Code § 384(b) (unpaid funds in class action litigation may be paid to nonprofit organizations to support projects that will indirectly benefit the class, to child advocacy programs, or to nonprofit organizations providing legal services to the indigent).[24]

The Court finds that the disposition of unclaimed funds in a class action in federal court is properly classified as procedural.  Federal law governs, and therefore the disposition of the unclaimed funds is a matter within the discretion of this Court.  See, e.g., Wilson, 880 F.2d at 811.

However, in order to allow the State of Texas the opportunity to appeal this determination, the Court ORDERS the Settlement Administrator to set aside from the remaining Settlement Amount, in an interest earning account, a total of $4,638,286 until such time as any and all appeals in this litigation involving the State of Texas have been fully resolved and the results have been reported to this Court.  If the State of Texas appeals and does not prevail, or if the State of Texas fails to appeal, the funds which have been set aside pursuant to this Order shall revert into the Final Unclaimed Fund without further order of the Court.

---

[24]   Application of state unclaimed property laws also would result in the practical difficulty of determining how to accurately apportion the pool of unclaimed funds between the various States.  In this litigation, for example, it is a fair assumption that of the thousands of checks which were sent to Class Members with a last-known Texas address, and which have not yet been cashed or which have been returned as undeliverable, at least some of those funds belong to Class Members who now reside in a state outside of Texas.  (See D.E. 954-4, Pulliam Aff. ¶ 21.)

### 4.        Disposition of the Remaining Funds

As of June 29, 2007, the accounts in which the Net Settlement Fund are held contained $11,355,821.  (D.E. 954-4, Pulliam Aff. ¶ 20.)  This amount will change based upon the rulings in this Order, and it potentially may change yet again based on the results of any appeal(s).  Specifically, as set forth above, the amount will be increased by Mobil's reimbursement of $167,026 (representing its share of the cost of Settlement Administration), and will be decreased by the award of $521,211.40 in administrative costs for Garden City, Econ One, and Susman Godfrey.  This amount will be further decreased, at least temporarily, by (a) the $378,833.88 which has been ordered to be set aside in a separate account pending resolution of any appeal by Chesapeake, and (b) the $4,638,286 which has been ordered to be set aside in a separate account pending resolution of any appeal by the State of Texas.  Finally, this amount is subject to being decreased by the portion of IOPA's $1,648,580 claim (including attorneys' fees) which is ultimately paid.

Additionally, the Court GRANTS Susman Godfrey's request to set aside $40,000 "as a reserve for out-of-pocket costs (including consulting with the Settlement Administrators, as appropriate) that Susman Godfrey may incur in connection with the[] appeals [by Chesapeake, IOPA and the State of Texas]."  (D.E. 954, at 14.)  The Court ORDERS the Settlement Administrator to set aside from the remaining Settlement Amount, in an interest earning account, a total of $40,000 until such time as any and all appeals in this litigation have been fully resolved and the results have been reported to this Court.  If there are no further appeals in this litigation, the funds which have been set aside pursuant to this Order shall revert into the Final Unclaimed Fund without further order of the Court.

In summary, after Mobil's reimbursement and all ordered costs are paid, and if IOPA's claim (including attorneys' fees) is paid in full, and if Chesapeake and the State of Texas both appeal and prevail fully, and if Susman Godfrey is awarded the entire $40,000 set-aside, then the Net Settlement Fund would be reduced by a total of $7,059,885.28.  Based upon the amount in the Fund as of June 29, 2007, this would leave $4,295,935.72 remaining in the Net Settlement Fund.

Moreover, as of June 29, 2007, unreturned, uncashed checks mailed to Class Members total $4,349,522.  The Class Counsel Report states that "over time a small number of class members might continue to negotiate checks."  (D.E. 954, at 11.)  The Report does not provide details concerning these checks, such as how many (and totaling what amount of money) belong to Class Members with last known addresses in Texas,[25] and whether any of these checks have a date after which they may not be negotiated.  Based upon the information currently before the Court, it appears that the Settlement Administrators have made significant efforts to locate Class Members who are due a distribution, and have completed four rounds of distribution over multiple years.  (D.E. 954, at 11.)  However, prior to closing the settlement administration process, the Court must be certain it has been apprised of all relevant facts.

Therefore, no later than 30 days from the date this Order is filed, the Settlement Administrator is ORDERED to file a report (a) providing an update as to how many of the unreturned, uncashed checks mailed to Class Members (and totaling what amount of money) have been negotiated since the time covered by the Class Counsel Report; (b) stating how many of the unreturned, uncashed checks (and totaling what amount of money) belong to Class

---

[25]  If and when any of these checks belonging to Class Members with a last known Texas address are negotiated, this will reduce the total amount of money which may be claimed by the State of Texas for its Unclaimed Property Fund.

Members with a last known address in Texas; and (c) stating any information which has not been previously submitted to the Court relevant to a determination of the likelihood that these checks will be negotiated in the future (including, but not limited to whether any of these checks have a date after which they may not be negotiated).[26]

Finally, the Settlement Agreements provide that if unclaimed funds exist, "the Settling Parties shall apply to the District Court for directions as to its disposition."  (D.E. 136, Global Settlement Agreement ¶ 1.56.)  The Class Counsel Report makes such an application.  (D.E. 954, at 11.)

### a.    Alternatives

Federal courts have held that a district court's alternatives for distributing unclaimed class action funds include: (1) pro rata distribution of the funds to located or claiming Class Members; (2) reversion to Defendants; (3) distribution as additional attorneys' fees to Class Counsel; (4) escheat to a governmental body; and (5) cy pres distribution.  See Wilson, 880 F.2d 813-16 (referencing alternatives (1), (2), (3), and (5)); see also Powell, 119 F.3d at 706 (referencing alternatives (1), (2), (4), and (5)); Six Mexican Workers, 904 F.2d at 1307 (referencing alternatives (1), (2), (4), and (5)); Diamond Chem. Co., Inc. v. Akzo Nobel Chems. B.V., --- F. Supp. 2d ----, 2007 WL 1427014, at *4 (D.D.C., May 14, 2007)  (referencing alternatives (1), (2), (4), and (5)); see generally 2 Newberg and Conte, Newberg on Class Actions § 10.15 at 10-38, 10-39.  "The district court's choice among distribution options should

---

[26]    Additionally, this report shall include a certification that the orders contained herein have been complied with, and the report shall provide an updated accounting of all accounts in which any Settlement funds are held, including those which have been set aside by order of the Court.

be guided by the objectives of the underlying statute and the interests of the silent class

members." Six Mexican Workers, 904 F.2d at 1307 (citation omitted).

      This case is unique among published cases in that no one has claimed a legal or equitable

interest in the balance of the unclaimed funds. Cf., e.g., Wilson, 880 F.2d at 813-16 (both

defendant and class counsel claimed an equitable interest in the balance of the fund). For this

reason alone, the Court finds that the first four alternatives enunciated above are inappropriate in

this case: the located or claiming Class Members, as well as Defendants and Class Counsel, have

all waived any claim to the balance of the unclaimed funds; and escheat to a governmental body

has been held to not be appropriate if "this option is not urged by any party." Diamond Chem.

Co., --- F. Supp. 2d ----, 2007 WL 1427014, at *4.

      Even if the located or claiming Class Members had not waived any claim to the

remaining funds, distributing the unclaimed funds pro rata to the located or claiming Class

Members would be inappropriate because it would give these Class Members a windfall; it might

also (a) encourage the bringing of class actions likely to result in a large amount of unclaimed

funds, and (b) create conflicts of interest between named plaintiffs and other class members. See

Van Gemert v. Boeing Co., 553 F.2d 812, 815-16 (2d Cir. 1977) ("The problems inherent in

appellants' proposal are readily apparent. This method expressly contemplates that silent class

members will not receive any compensation, even indirectly. The claims of the silent class

members would be expropriated and a windfall might result for those who appeared and

collected their share of the damages. Consequently, this procedure might encourage the bringing

of class actions likely to result in large uncollected damage pools. It also raises serious questions

as to the adequacy of representation where the interests of the named plaintiffs lie in keeping the

other class members uninformed.") (quotation omitted); see also In re Folding Carton Antitrust Litig., 557 F. Supp. 1091, 1107 (N.D. Ill. 1983) ("[I]t is apparent that a further distribution to class members who voluntarily settled their claims for the substantial amount they have already received, would be an undeserved windfall.").

Likewise, even if Defendants had not waived any claim to the remaining funds, it would be inappropriate to distribute the funds to them because Defendants were accused of violating the Sherman Act, "the overriding policy of which is punishment and deterrence."  Wilson, 880 F.2d at 815 (citing In re Folding Carton Antitrust Litig., 557 F. Supp. at 1105 ("[I]n light of the Sherman Act policy of deterrence and the defendants' wrongdoing, we reject [defendants'] equitable claim to the [reserve] fund.")); see also Six Mexican Workers, 904 F.2d at 1307-08 (reversion of the balance of the fund to the defendant is appropriate only when deterrence is not a goal of the statute alleged to have been violated); Diamond Chem. Co., --- F. Supp. 2d ----, 2007 WL 1427014, at *5-6 (same).

Similarly, while Class Counsel has capably represented the Class Members throughout this lengthy litigation, Class Counsel has been fully compensated.  Cf. Wilson, 880 F.2d at 815-16 (class counsel had an equitable claim to the remaining funds because they had not yet been fully compensated); Van Gemert, 553 F.2d at 816 (unclaimed funds may not be used to defray the legal expenses of the claiming members of the class, because "what [plaintiffs] may not gain directly, ... they may not gain indirectly").  In the absence of any additional request for fees, accompanied by evidence demonstrating how those fees have been earned, this Court declines to award additional fees to Class Counsel.

The Court also may order that the unclaimed funds escheat to a governmental body.  One court has held that a federal court may escheat unclaimed funds in class action litigation to the federal government pursuant to the "spirit of" 28 U.S.C. §§ 2041 & 2042.[27]  See In re Folding Carton Antitrust Litig., 744 F.2d 1252, 1255 (7th Cir. 1984).  "Although the term escheat is used, the United States obtains no beneficial interest in the funds but merely holds the money as trustee for the rightful owners."  Powell v. Georgia-Pacific Corp., 843 F. Supp. 491, 497 (W.D. Ark. 1994) (citing, inter alia, In re Folding Carton Antitrust Litig., 744 F.2d at 1257 (Flaum, J., concurring in part and dissenting in part); U.S. v. Klein, 303 U.S. 276, 279-80 (1938)).  Given the specific facts of this case, including the large number of unpaid Class Members and the thorough efforts already made to locate and distribute funds to them, and given the fact that "[t]he United States government cannot obtain title to the money," In re Folding Carton Antitrust Litig., 744 F.2d at 1257 (Flaum, J., concurring in part and dissenting in part), this Court finds that escheat to the federal government would be inappropriate as the majority of the remaining funds would likely languish unspent, providing no benefit to anyone.  See Schwartz v. Dallas Cowboys Football Club, Ltd., 362 F. Supp. 2d 574, 577 (E.D. Pa. 2005) ("The Court ...

---

[27]   Section 2041 provides that "[a]ll moneys paid into any court of the United States, or received by the officers thereof, in any case pending or adjudicated in such court, shall be forthwith deposited with the Treasurer of the United States or a designated depositary, in the name and to the credit of such court."  28 U.S.C. § 2041.  Section 2042 provides:

In every case in which the right to withdraw money deposited in court under section 2041 has been adjudicated or is not in dispute and such money has remained so deposited for at least five years unclaimed by the person entitled thereto, such court shall cause such money to be deposited in the Treasury in the name and to the credit of the United States.  Any claimant entitled to any such money may, on petition to the court and upon notice to the United States attorney and full proof of the right thereto, obtain an order directing payment to him.

28 U.S.C. § 2042.

concludes that ... escheat [of the excess funds from an antitrust class action settlement] to the federal government would serve no public purpose.").

The Court similarly finds that escheat to various state governments[28] is inappropriate both because of the risk identified in the preceding paragraph of the money not benefitting anyone, and because of the substantial additional expense which would be required for Class Counsel and/or the Settlement Administrator to examine the escheat/unclaimed property laws of 45 states and the District of Columbia, and then allocate the remaining funds according to those varying laws.  (See D.E. 954-4, Pulliam Aff. ¶ 21, Ex. G (listing the percentile breakdown of uncashed and undeliverable checks by state of last known residence).)

The Court therefore must consider whether to distribute the remaining funds via a cy pres distribution.

### b.  Cy Pres Distribution

The cy pres doctrine has been described in the following terms:

This disposition of funds that have not been individually distributed, by distributing them for the next best use which is for indirect class benefit, has been approved under the equitable power of courts in various cases under the analogous cy pres doctrine.  The cy pres, or next best use, doctrine originated in the charitable trust field when courts took steps to prevent the failure of trusts.  In

---

[28]  Although the Court has found that it is not required to apply state law in determining the disposition of the remaining funds, it may nonetheless exercise its discretion to order escheat of the remaining funds to state governments.  See Powell v. Georgia-Pacific Corp., 843 F. Supp. 491, 497 (W.D. Ark. 1994) ("Application of state escheat laws to unclaimed funds created under federal law has been recognized as a viable alternative [for the disposition of unclaimed funds in a class action in federal court].") (citing Hodgson v. Wheaton Glass Co., 446 F.2d 527, 535 (3d Cir. 1971)).

the class action context, cy pres applications have also been referred to as fluid

class recovery distributions.

2 Newberg on Class Actions, at § 11.20.  "[C]y pres distribution, requires the distribution of the

funds for the indirect benefit of the class.  This method has been somewhat controversial and is

most often used in the cases involving settlements of class actions rather than adjudicated class

actions."  Powell, 843 F. Supp. at 497 (citing Six Mexican Workers, 904 F.2d at 1307

(consideration of cy pres distribution appropriate in case involving unclaimed funds); In re Agent

Orange Prod. Liab. Litig., 597 F. Supp. 740, 841 (E.D.N.Y. 1984)).

In Wilson, the Fifth Circuit held that a cy pres distribution of a class action residual fund

was an abuse of discretion primarily because the defendant and class counsel had equitable

claims to the fund, but also because the fund had already "achieved the remedial purposes of

Title VII," the class size was relatively small and the nonclaiming class members did not have a

strong equitable claim.  See Wilson, 880 F.2d at 812-16.  The Wilson court contrasted the

situation before it with that faced by the court in In re Folding Carton Antitrust Litig., 557 F.

Supp. 1091, 1107 (N.D. Ill. 1983), and stated:

> In sum, when we consider the equities, [defendent] and class counsel have potent
>
> equitable claims on the residue of the fund, and the nonclaiming class members
>
> have no equitable rights.  This case is therefore distinguishable from Folding
>
> Carton where neither the defendants nor class counsel had convincing equitable
>
> claims, and only the nonclaiming class members had equitable rights.  The court
>
> there was compelled to apply the cy-pres doctrine only because it could not effect
>
> distribution of the fund balance to the sole deserving group, the nonclaiming class

members.  Because here the substantial purposes of the fund had been achieved,

because the nonclaiming class members had no equitable rights, and because the

district court ignored the equitable rights of Southwest and class counsel, we hold

that the district court abused its discretion in awarding the fund balance to [a

charity].

Id. at 816.

The facts of this case stand in sharp contrast to those faced by the Fifth Circuit in Wilson.

As discussed above, neither the Settling Defendants nor Class Counsel have equitable claims to

the remaining funds, and neither have attempted to assert any such claim.  Meanwhile, the Class

Members who have not been able to receive the funds they are due have the sole remaining

equitable claim to the remaining funds.  For example, it is apparent that many, if not most, of

these Class Members have not been paid simply because they could not be located due to the fact

that they changed addresses during the lengthy litigation process.  The Court declines to punish

these Class Members for this, but instead will exercise its discretion to order that the remaining

funds be used for their indirect benefit, via the cy pres doctrine.

The Court next must determine the best use for these funds.  "In applying cy pres

principles, it is appropriate for a court to consider (1) the objectives of the underlying statute(s),

(2) the nature of the underlying suit, (3) the interests of the class members, and (4) the

geographic scope of the case."  Diamond Chem. Co., --- F. Supp. 2d ----, 2007 WL 1427014, at

*7; see also In re Airline Ticket Comm'n Antitrust Litig., 307 F.3d 679, 682 (8th Cir. 2002)

(same); Schwartz, 362 F. Supp. 2d at 576 (same).  Moreover, "the instant case ... arises out of a

pretrial settlement.  As the Supreme Court has recognized, a district court may 'provide[] broader

relief [in an action that is resolved before trial] than the court could have awarded after a trial." In re Agent Orange Prod. Liab. Litig., 818 F.2d 179, 185 (2d Cir. 1987) (quoting Local No. 93, Int'l Assoc. of Firefighters v. City of Cleveland, 478 U.S. 501, 525 (1986)).  Further, "[a]t least one court after having examined the case law in this area, has concluded the [cy pres] doctrine is no longer regarded as being limited and restricted to the closest comparable alternative to the original purpose and is regarded as being more flexible."  Powell, 843 F. Supp. at 497 (citing Superior Bev. Co. v. Owens-Illinois, 827 F. Supp. 477, 479 (N.D. Ill. 1993)).  In Superior Beverage, the court stated: "[W]hile use of funds for purposes closely related to their origin is still the best cy pres application, the doctrine of cy pres and courts' broad equitable powers now permit use of funds for other public interest purposes by educational, charitable, and other public service organizations, both for current programs or, where appropriate, to constitute an endowment and source of future income for long-range programs to be used in conjunction with other funds raised contemporaneously."  Superior Bev. Co., 827 F. Supp. at 479.

During the last two telephonic hearings, this Court discussed with the parties using the remaining funds on a project which monitors the air quality in one or more Texas cities.  This Court has previous experience working on such a project with the University of Texas at Austin, as part of a Court Ordered Condition of Probation in United States v. Koch Petroleum Group, L.P., S.D. Tex. Cause No. 2:00-cr-325.  In the present litigation, Class Counsel has had discussions about such a project with David Allen, who is both the Gertz Regents Professor in Chemical Engineering and Director of the Center for Energy and Environmental Resources at the University of Texas at Austin.  Dr. Allen's air quality team at the University of Texas has worked with this Court for over three years in connection with Koch.  According to Class

Counsel, Dr. Allen suggested a number of possible projects, the estimated cost of which ranged

from as little as $2 million to as much as $10 million.  (D.E. 954, at 12.)  After discussion, Class

Counsel and Dr. Allen have recommended one of those projects to the Court: the "Neighborhood

Air Toxics Modeling Project for Houston and Corpus Christi" ("Project").  (D.E. 954, Ex. 4.)

        This proposed Project "would adapt [existing] regional air quality models for use at a

finer scale (hundreds of meters rather than multiple kilometers) in Corpus Christi and Houston.

The models would also be adapted to track individual air toxics, such as benzene and

butadiene....  Once the models are successful in tracking historical air pollution episodes for

Houston and Corpus Christi, they would be used on a routine basis to rapidly evaluate emission

events detected by the air toxics monitoring networks in Houston and Corpus Christi."  (Id.)  The

proposed budget for this project is $4 million, over four years, although the project could be

expanded if more money is available.[29]

        Based upon the information provided in this case and in connection with the above-

mentioned Koch case, the Court finds that concentrations of air toxics in Houston and Corpus

Christi are a matter of significant public concern.  As stated in the Project proposal, "[m]aking

[the proposed] measurements of air toxics and other air pollutants is a critical first step in

developing plans to reduce air pollutant concentrations."  (Id.)

        The Court finds that there is a connection between this Project and the subject of this

litigation.  The air toxics which will be measured by the Project are air toxics endemic to the oil

production at the heart of this litigation.  See, e.g., 72 Fed. Reg. 32-33 (Jan. 3, 2007) (to be

_____

        [29]  An agreement will have to be negotiated with the University of Texas, a detailed work
plan will have to be prepared based on that agreement, and many other details will have to be
worked out.  Further, the implementation of the plan would be subject to the University of
Texas' audit process, just as the current project in connection with Koch is.

codified at 40 C.F.R. Pt. 63) (setting forth national emission standards for hazardous air

pollutants from oil and natural gas production facilities).  In circumstances such as in this case,

when "there is no obvious use for the money that provides a particular benefit to class members,"

a court should search for a use of the fund which has at least a "thin" link to the suit.  Jones v.

Nat'l Distillers, 56 F. Supp. 2d 355 (S.D.N.Y. 1999) (donating excess funds from a twenty-year-

old suit to a legal aid society, noting that there was no obvious cause associated with the class

and that "[t]he tie to the intent of the fund is thin, but not as thin as it would be if the donation

served an entirely unconnected cause such as a dance performance or a zoo"); see also In re

Infant Formula Multidistrict Litig., No. 4:91-CV-878, 2005 WL 2211312, at *3 (N.D. Fla., Sept.

8, 2005) (donating unclaimed funds from settlement of infant formula antitrust litigation to the

American Red Cross Hurricane Katrina Disaster Relief Fund) ("The complaint in this case ...

alleged injury to consumers of infant formula, through alleged unfair pricing.  Likewise, one of

the challenges faced by rescue workers in the areas affected by Hurricane Katrina is providing

essential food and drink to the victims of the storm.").  In this case, there is a sufficient link

between the subject of this litigation and the proposed Project.

 Although this Project has no connection with the Sherman Act or antitrust issues, there

are no ready options in that field.  For example, over twenty years ago, the Seventh Circuit held

that it was an abuse of discretion for a district court "to utilize the reserve fund [in a Sherman

Act litigation] to establish a tax-exempt Foundation for research on complex antitrust litigation

and on various substantive aspects of the antitrust laws."  In re Folding Carton Antitrust Litig.,

744 F.2d 1252, 1254 (7th Cir. 1984).  The court stated:

> After careful consideration, we conclude that the establishment of the proposed
> Foundation would be carrying coals to Newcastle.  There has already been
> voluminous research with respect to multidistrict antitrust litigation and the
> substantive and procedural aspects of the antitrust laws by judges, lawyer
> specialists, law schools, bar associations, Congressional committees, the
> Department of Justice and the Federal Trade Commission, and it is a continuing
> project of all those concerned.  In our view, establishing an unneeded Foundation
> for these purposes from the reserve fund would be a miscarriage of justice and an
> abuse of discretion.

Id. at 1254-55.  If such a use of remaining funds in an antitrust class action was unnecessary in 1984, it is no less unnecessary today.

By contrast, the proposed Project in this case promises to build upon existing knowledge in a meaningful manner.  Further, while the proposed Project is focused on a limited geographic area, it has the potential to produce information and models which would have nationwide application.  The data collected will be made publicly available for use by other individuals and organizations throughout the country.

Finally, the Court has worked with the Center for Energy and Environmental Resources at the University of Texas for over three years in connection with the Court Ordered Condition of Probation in Koch and has found this organization to be highly competent, professional and economical with its funds.  Cf. Six Mexican Workers, 904 F.2d at 1308 (reversing a cy pres distribution to a charity because, inter alia, the charity "is not an organization with a substantial record of service").

Therefore, the Court will conditionally approve a cy pres distribution of $4 million from the remaining funds in this litigation to implement the "Neighborhood Air Toxics Modeling Project for Houston and Corpus Christi," attached as Exhibit 4 to the Class Counsel Report. (D.E. 954, Ex. 4.)  This approval is conditioned on (1) the contents of the Settlement Administrator's report providing details concerning the remaining funds, as ordered herein,[30] and (2) an agreement being negotiated with the University of Texas, and then a detailed work plan being prepared and submitted to the Court along with a motion for final approval of the funds.[31] Further, the implementation of the plan would be subject to the University of Texas' audit process, just as the current project in connection with Koch is.  (D.E. 954, at 12 n.10.) Depending upon the amount of funds remaining after any appeal(s), the Court may approve additional funds for the proposed Project or other projects in the future.

As is appropriate for such a cy pres distribution, this Court will maintain continuing jurisdiction over the remaining funds in order to supervise the proposed Project and any future distributions.  See Six Mexican Workers, 904 F.2d at 1308-09 ("[A]ny distribution plan should be supervised by the court or a court appointed master to ensure that the funds are distributed in accordance with the goals of the remedy."); In re Agent Orange Prod. Liab. Litig., 818 F.2d at 185 ("[W]e believe that the district court must ... designate and supervise, perhaps through a special master, the specific programs that will consume the settlement proceeds.").

---

[30]   These details are necessary for the Court to ensure that there are sufficient funds (which have not already been set aside pending any appeal(s)) for this project.

[31]   To the extent feasible, Dr. Allen and the Center for Energy and Environmental Resources shall endeavor to coordinate their efforts with the Texas Commission on Environmental Quality, the U.S. Environmental Protection Agency, and/or any other entities which, in Dr. Allen's judgment, would help further the Project's goals.

However, in order to allow the appellate process to commence, the Court--in a future order--will relinquish its retention of continuing jurisdiction to "enforce, administer, and interpret the settlement agreement."  McMahon Found., 98 Fed. Appx. at 271, 2004 WL 363137, at *2; see also D.E. 595-601, 607.  The Court will issue this order relinquishing jurisdiction after the remand of IOPA's claim to the Settlement Administrator has been resolved.

## III.  CONCLUSION

As stated more fully above, it is hereby ORDERED:

•     Except as discussed above, the accounting of the Settlement Amount as reflected in the Class Counsel Report and all attachments is approved as reasonable and adequate.

•     Garden City is awarded an additional $351,264.61 from the remaining Settlement Amount for reasonable and previously un-reimbursed fees and expenses incurred in administering the Settlements as co-Settlement Administrator.

•     Econ One is awarded an additional $162,908.79 from the remaining Settlement Amount for reasonable and previously un-reimbursed fees and expenses incurred in administering the Settlements as co-Settlement Administrator.

•     Susman Godfrey is awarded an additional $7,038 from the remaining Settlement Amount for reasonable and previously un-reimbursed out-of-pocket expenses incurred in overseeing Garden City, Econ One, and the administration process.

•     To the extent it has not already been done, Mobil shall reimburse the Net Settlement Fund the amount of $167,026 no later than 30 days after the date this Order is filed.

•     No later than 30 days after the date this Order is filed, Susman Godfrey shall file a report on the status of the distribution of the Apache Settlement.

- IOPA's Motion for Reconsideration (D.E. 961 & 965) is GRANTED.  IOPA's claim is REMANDED to the Settlement Administrator.  No later than 30 days after the date this Order is filed, the Settlement Administrator is ORDERED to (1) pay IOPA the amount of IOPA's claim which the Settlement Administrator or its designee determines has been properly substantiated by IOPA, and (2) file with the Court a report indicating what was paid to IOPA, and, if this amount is less than the full amount of IOPA's claim, a statement of the reason(s) the claim was not paid in full.  No later than 20 days after the Settlement Administrator files this report, IOPA may file a response.  If IOPA continues to seek attorneys' fees and expenses for bringing the Motion for Reconsideration, IOPA shall support its request with authority and evidence in its response to the Settlement Administrator's report.

- The Settlement Administrator shall set aside from the remaining Settlement Amount, in an interest earning account, a total of $378,833.88 until such time as any and all appeals in this litigation involving Chesapeake have been fully resolved and the results have been reported to this Court.  If Chesapeake appeals and does not prevail, or if Chesapeake fails to appeal, the funds which have been set aside pursuant to this Order shall revert into the Final Unclaimed Fund without further order of the Court.

- The Settlement Administrator shall set aside from the remaining Settlement Amount, in an interest earning account, a total of $4,638,286 until such time as any and all appeals in this litigation involving the State of Texas have been fully resolved and the results have been reported to this Court.  If the State of Texas appeals and does not prevail, or if the

State of Texas fails to appeal, the funds which have been set aside pursuant to this Order shall revert into the Final Unclaimed Fund without further order of the Court.

- The Settlement Administrator shall set aside from the remaining Settlement Amount, in an interest earning account, a total of $40,000 as a reserve for Susman Godfrey's future out-of-pocket costs until such time as any and all appeals in this litigation have been fully resolved and the results have been reported to this Court.  If there are no further appeals in this litigation, the funds which have been set aside pursuant to this Order shall revert into the Final Unclaimed Fund without further order of the Court.

- All interest earned on the remaining Net Settlement Fund after the dates reflected in the Class Counsel Report shall continue to be added to the Net Settlement Fund.

- No later than 30 days after the date this Order is filed, the Settlement Administrator shall file a report (a) providing an update as to how many of the unreturned, uncashed checks mailed to Class Members (and totaling what amount of money) have been negotiated since the time covered by the Class Counsel Report; (b) stating how many of the unreturned, uncashed checks (and totaling what amount of money) belong to Class Members with a last known address in Texas; and (c) stating any information which has not been previously submitted to the Court relevant to a determination of the likelihood that these checks will be negotiated in the future (including, but not limited to whether any of these checks have a date after which they may not be negotiated).  Additionally, this report shall include a certification that the orders contained herein have been complied with, and the report shall provide an updated accounting of all accounts in

which any Settlement funds are held, including those which have been set aside by order of the Court.

- Subject to the conditions discussed above, the Court conditionally approves a cy pres distribution of $4 million from the remaining funds in this litigation to implement the "Neighborhood Air Toxics Modeling Project for Houston and Corpus Christi," attached as Exhibit 4 to the Class Counsel Report.  (D.E. 954, Ex. 4.)

- The Clerk of this Court is ordered to deliver a copy of this Order to the State of Texas.

- Until this Court issues an order expressly stating otherwise, this Court retains continuing jurisdiction over the remaining funds in this litigation, the Settling Parties and the Settlement Class.  This continuing jurisdiction includes jurisdiction to order injunctive relief for the purposes of  enforcing, administering, and interpreting the Settlement Agreements.

SIGNED and ORDERED this 12th day of December, 2007.

Janis Graham Jack
United States District Judge