**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

In re: LEASE OIL ANTITRUST    §
LITIGATION (No. II)             §          **MDL No. 1206**
                                  §
                                  §

## ORDER

On this day came on to be considered Class Plaintiffs' Motion for Summary Judgment (D.E. 1090) and Intervenor State of Texas's Motion for Final Summary Judgment (D.E. 1091). For the reasons stated herein, the Court GRANTS Class Plaintiffs' Motion for Summary Judgment and DENIES Intervenor State of Texas's Motion for Final Summary Judgment.

## I.     Jurisdiction

This Court has jurisdiction to consider the issues raised in the motions for summary judgment and to issue the order contained herein, pursuant to the explicit retention of jurisdiction provision in the final judgments issued in this litigation. The provision states: "This Court shall retain continuing jurisdiction over the Settlement Amount (including the Interim Unclaimed Fund and the Final Unclaimed Fund), the Settling Parties and the Settlement Class Members. This continuing jurisdiction shall include jurisdiction to order injunctive relief for the purposes of enforcing, implementing, administering, construing and interpreting this Settlement Agreement." (D.E. 595-601, 607.) See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381-82 (1984) (stating that a court may retain continuing jurisdiction over a settlement agreement if such intention is written into the court order); Hospitality House, Inc. v. Gilbert, 298 F.3d 424, 430 (5th Cir. 2002) (citing Kokkonen).

## II.      Factual Background

This litigation began in July 1995, when the state of Texas filed a suit in state court, <u>State of Texas et al. v. Amoco Production Company, et al.</u>, pursuing claims for a putative class of Texas royalty payees against eight major oil companies, alleging that the oil companies had breached an implied duty under their leases to pay royalty owners the fair market value of their oil at the well.  (D.E. 967 at 1.)  In April 1996, a class action lawsuit was filed against 39 oil companies in federal court on behalf of a putative nationwide class of royalty and working interest owners, in <u>McMahon Foundation et al v. Amerada Hess Corp., et al.</u>, alleging that those companies had violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring for over a decade to artificially depress payments made for lease oil to putative class members.  In November 1997, <u>McMahon</u> presented to the court a settlement agreement with 24 defendants.  Before any ruling could be made on the settlement, however, the Judicial Panel on Multidistrict Litigation transferred <u>McMahon</u> and several later federal actions to this Court pursuant to 28 U.S.C. § 1407 as <u>In re Lease Oil Antitrust Litigation</u>, MDL-1206.  (D.E. 967 at 1-2; D.E. 1091-2 ¶ 4.)

Following consolidation, the Court held a preliminary fairness hearing at which it heard testimony about a proposed Global Settlement. The Court granted preliminary approval to the Global Settlement on October 28, 1998. Final settlements with seven other defendants were presented to the Court in December 1998 and were granted preliminary approval.  (D.E. 1091-2 ¶¶ 5-7.)  After the December 1998 hearing, the parties sent notice to the class members notifying them of the terms of the settlement and of the fairness hearing set for April 5, 1999.  The Court held final fairness hearings, and

on May 12, 1999, the Court approved the settlements as "fair, adequate, and reasonable" based on the record at the two fairness hearings and submissions to the Court, and gave the settlements "final approval." (D.E. 1091-2 ¶¶ 8-9.)

During the settlement administration process, over 446,000 checks were issued to Class Members.  (D.E. 1091-2 ¶ 10.)  The Settlement Administrator first distributed 432,852 checks between November 15, 2001 and February 28, 2002.  The Administrator then distributed 18,917 checks between March 1, 2002 and September 30, 2002, as well as a second distribution of 7,815 checks.  After making these distributions, the Administrator began to reissue checks issued in earlier distributions that were uncashed or returned as undeliverable. The Administrator reissued 1,418 checks between October 1, 2002 and November 15, 2004.  After these distributions, approximately $11,000,000 remained in the Settlement Fund.  The Administrator then made one final distribution, consisting entirely of checks reissued because the original check from an earlier distribution had not been cashed or had been returned as undeliverable.  During this final distribution, the Settlement Administrator sent out approximately 3,535 checks.  (D.E. 1091-2 ¶¶ 11-16.)

Although some checks were eventually delivered and cashed, $10,167,980 remained in unclaimed funds. (D.E. 1091-2 ¶ 17.)[1]  The $10,167,980 remaining after distribution was allocated to Class Members with last-known addresses in forty-six states and the District of Columbia. (D.E. 1091-2 ¶ 18.)  The Court determined that, of this total amount, $4,638,283 of those funds was allocated to Class Members with last-known addresses in Texas.  (D.E. 980 at 2 & n.1; D.E. 967 at 8; D.E. 1091-2 ¶ 19.))  These funds

---

[1] These funds have remained unclaimed since the Defendants first began to fund the Settlements in November 2001, a total of approximately eight years.  (D.E. 954-3, Pulliam Aff. ¶ 5; D.E. 1091-2 ¶ 11.)

came from three sources: checks that were mailed to Class Members but not cashed; checks that were mailed to Class Members but were returned as undeliverable; and settlement awards to Class Members that were below the de minimis amount.  (D.E. 1091-2 ¶ 20.)

The approved settlement agreement included a provision directing the parties to apply to the Court for direction as to the disposition of any unclaimed funds. (D.E. 1091-2 ¶ 2-3; D.E. 136 ¶ 1.56 ("If any such Final Unclaimed Fund exists, the Settling Parties shall apply to the District Court for directions as to its disposition, within 115 days after the Second Distribution Date.").) In its December 12, 2007 Order, the Court decided that the disposition of unclaimed funds in the case, including unclaimed funds attributable to persons with last-known addresses in Texas, was properly left to its discretion as a matter of federal law.  (D.E. 967 at 32.)  The Court, however, ordered that the Settlement Administrator set aside a portion of the funds pending the settlement of certain disputes, including the dispute currently before this Court.  Included in the amount set aside was the $4,638,283 belonging to Class Members with last known addresses in Texas, pending a possible appeal by the State of Texas.  (D.E. 967 at 32-33.)

Recognizing the various alternatives available for distribution of the unclaimed settlement funds, the Court decided to order a cy pres remedy and, except for the funds set aside, the Court ordered that the funds be distributed to the Center for Energy and Environmental Resources at the University of Texas to implement the "Neighborhood Air Toxics Modeling Project for Houston and Corpus Christi." (D.E. 967 at 46.)[2]  The

---

[2] Importantly, the parties do not dispute the Court's discretion to order a cy pres distribution in general, or the Court's choice of the "Neighborhood Air Toxics Modeling Project for Houston and Corpus Christi" as the destination for the unclaimed funds.  Rather, they only dispute the Court's authority to order a cy pres distribution for unclaimed funds belonging to class members with last-known Texas addresses.

$4,638,283 belonging to Class Members with last known addresses in Texas remained in a separate interest-earning account, and the Garden City Group, a Settlement Administrator, is currently in possession of these funds.  (D.E. 1091-2 ¶¶ 22-23.)

## III.   Procedural Background

On January 11, 2008, the State of Texas moved to intervene in this litigation to seek delivery of all unclaimed settlement funds belonging to class members whose last known address was in Texas.  (D.E. 975.)  The Court denied the State's motion.  (D.E. 979.)  On May 28, 2009, the Fifth Circuit reversed this Court's decision, holding that the State had timely moved to intervene and had an interest in the litigation because any unclaimed property deposited with the State would generate investment income for the State.  In re Lease Oil Antitrust Litig., 570 F.3d 244, 250-51 (5th Cir. 2009).[3]

On July 22, 2009, the State of Texas filed a Complaint in Intervention in this litigation.  (D.E. 1075.)   In its Complaint, the State argues that the $4,638,286 in unclaimed funds belonging to Class Members with last known addresses in Texas constitute property that is "presumed abandoned" under the Texas Property Code, Section 72.101.  The State argues that, pursuant to the Texas Unclaimed Property Act, Tex. Prop. Code Ann. § 74.301 (the "Texas Act"), the unclaimed property must be delivered to the Texas Comptroller.  (D.E. 1075 ¶¶ 2-5.)   The State requests that the Settlement

---

[3] Although the State represented to the Fifth Circuit that it only discovered the existence of this litigation days before filing its Motion to Intervene, the State in fact knew about it much earlier.  As early as November 1997, counsel presented a proposed agreement to the McMahon Court that initially included state governments as "class members" to be included in the settlement.  (D.E. 233 at 9.)  Further, in June 1998, the State, as a plaintiff in State of Texas, et al. v. Amoco Production Co., et al., agreed to coordinate discovery with related federal cases to help achieve a settlement in MDL 1206.  (D.E. 233 at 3 & n.4.)  Finally, as noted in the Court's earlier Order on the State's Motion to Intervene, Class Counsel informed the Texas Attorney General's office of the possibility of unclaimed settlement funds in this litigation in March 2006, almost two years before the State filed its original Motion to Intervene.  (D.E. 979 at 8-9; D.E. 950, Transcript of March 31, 2006 Hearing, 13: 17-18) ("[Class Counsel] did call the [Texas] Attorney General's Office, and [the State] made it clear that if there ends up being a significant amount of money, they might be willing to challenge a court order that sends money anywhere other than to the States.").)

Administrator pay the abandoned property at issue, plus interest, to the Texas Comptroller, and provide the Comptroller "with documentation showing the name, social security number, drivers license number or state identification number, email address, and last known-address of every class member whose settlement proceeds are included in the abandoned property at issue, along with the amount of settlement proceeds allocated to each class member."  (D.E. 1075 ¶ 6.)

On August 20, 2009, Class Plaintiffs filed a Motion for Summary Judgment with respect to the State's Complaint in Intervention.  (D.E. 1090.)  On August 21, 2009, the State of Texas filed its Motion for Summary Judgment. (D.E. 1091.)  The Court held oral arguments on November 20, 2009.  At issue on summary judgment is whether the disposition of the settlement proceeds belonging to Class Members with last known addresses in Texas is governed by the Texas Act or is instead committed to the Court's discretion under Federal Rule of Civil Procedure 23, unconstrained by state unclaimed property laws.  The Fifth Circuit in Paterson v. Texas specifically declined to resolve this issue, instead ruling on procedural grounds.  308 F.3d 448, 450-51 (5th Cir. 2002) ("We do not decide the issue of whether, in this federal class action suit, the reach of Texas substantive law governs that portion of the nationwide settlement which settles claims of Texas citizens.").

Class Plaintiffs divide their summary judgment argument into three parts.  First, they contend that the Court's authority to approve distribution of unclaimed settlement funds is governed by Federal Rule of Civil Procedure 23, which grants the Court broad discretion in approving a class action settlement.  Under the analysis developed in Hanna v. Plumer, they argue that there is a "direct collision" between Rule 23(e) and the Texas

Act.  As there is a "direct collision" and Rule 23(e) is consistent with the Constitution and the Rules Enabling Act, Class Plaintiffs conclude that Rule 23(e) must control. (D.E. 1090 at 5-16.)  Second, they argue that even if there is no "direct collision" between the Federal Rule and state law, and rather the discretionary control over distribution of unclaimed settlement funds is a federal practice inconsistent with state law, application of Erie principles necessarily leads to the conclusion that federal law controls. (D.E. 1090 at 16-22.)  Finally, Class Plaintiffs contend that, even if the Texas Act applies, it does not necessarily require the Court to turn the unclaimed funds over to the State Comptroller; rather, one state appeals court recently approved a cy pres remedy to dispose of unclaimed state class action settlement funds, and the Texas Supreme Court has not yet addressed how the Texas Act operates in the context of class action settlements.  (D.E. 1090 at 22-24.)

For its part, the State of Texas argues that the Court must apply the Texas Act and order that the unclaimed funds be transferred to the State Comptroller.  The State contends that there is no "direct collision" between Rule 23 and the Texas Act, as Rule 23 does not discuss unclaimed funds or authorize cy pres distributions.  (D.E. 1091 at 4.)  Because the Texas Act is substantive under Erie, the State argues, it must be applied. (D.E. 1091 at 5-11.)  Concluding that the Texas Act is applicable, the State then argues that the statute requires that unclaimed settlement funds belonging to class members with last known addresses in Texas be turned over to the Texas Comptroller.  (D.E. 1091 at 11-17.)

**IV.     Discussion**

    **A.     Summary Judgment Standard**

Summary judgment is appropriate in a case where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Scott v. Harris, 550 U.S. 372, 380 (2007).  Here, the Parties do not dispute the material facts; rather, a purely legal issue is in dispute.

    **B.     Applicable Framework for Analysis**

The lawsuits comprising this multidistrict litigation predominately arose under federal antitrust laws.  The McMahon Foundation case, for example, was brought under Sections 4 and 6 of the Clayton Act, 15 U.S.C. §§ 15, 26, to recover treble damages and obtain injunctive relief for the defendant oil companies' alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  McMahon Found., et al v. Amerada Hess, et al., 4:96-cv-1155.  In addition, certain cases were based upon state law, such as for breach of contract.  Regardless of the underlying basis of the claims and the basis of this Court's subject matter jurisdiction, the principles first established in Erie R. Co. v. Tompkins, 304 U.S. 64 (1938) and developed in subsequent cases are applicable here.  As the Fifth Circuit has explained, "[u]nder Erie, federal courts apply state substantive law 'to any issue or claim which has its source in state law.'  Yet, federal law, rather than state law, invariably governs procedural matters in federal courts."  Camacho v. Texas Workforce Comm'n, 445 F.3d 407, 409 (5th Cir. 2006) (citing 19 Charles A. Wright, Arthur A. Miller, & Edward H. Cooper, Federal Prac. & Proc. § 4520 (2d ed. 2002)).  While state law issues most frequently arise in diversity cases, it is a "frequently assumed, but erroneous, proposition that Erie applies only in diversity cases. The Erie case and the

Supreme Court decisions following it apply in federal question cases as well." Id. at 409 n.1 (citing Wright, Miller & Cooper, 19 Fed. Prac. & Proc. § 4520); First S. Fed. Sav. & Loan Assoc. of Mobile, Ala. v. First S. Sav. and Loan Assoc. of Jackson County, Miss., 614 F.2d 71, 73 (5th Cir. 1980) ("The doctrine advanced in Erie . . . often is spoken of as automatically applying in cases in which jurisdiction is based on diversity of citizenship. This view is erroneous, however. The Erie result applies to any issue 'governed by state law operating of its own force,' regardless of the jurisdictional basis."); see also, e.g., Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1102 (9th Cir. 2003) ("Erie applies irrespective of whether the source of subject matter jurisdiction is diversity or federal question."); Wright, Miller & Cooper 19 Fed. Prac. & Proc. § 4520 ("It frequently is said that the doctrine of Erie . . . applies only in diversity of citizenship cases; this statement simply is wrong. The Erie case and the Supreme Court decisions following it apply in federal question cases as well.").  However, "the Federal Rules of Civil Procedure apply irrespective of the source of subject matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal."  Vess, 317 F.3d at 1102 (citing Hanna v. Plumer, 380 U.S. 460, (1965)).

Since the Federal Rules of Civil Procedure apply regardless of the basis of subject matter jurisdiction or the substantive law at issue, the Court first considers whether Federal Rule of Civil Procedure 23(e) controls.  Because Erie principles are also applicable, the Court then considers the State's argument that, in the absence of a direct collision between Rule 23(e) and Texas law, the Texas Act is substantive and must be applied.

**C.**   **The Distribution of Unclaimed Settlement Funds is Governed by Federal Rule of Civil Procedure 23**

**1.**   **<u>Hanna</u> Analysis**

To resolve a conflict between state law and a Federal Rule of Civil Procedure, "[t]he initial step is to determine whether, when fairly construed, the scope of [the] Federal Rule . . . is 'sufficiently broad' to cause a 'direct collision' with the state law or, implicitly, to 'control the issue' before the court, thereby leaving no room for the operation of that law." <u>Burlington N. R. Co. v. Woods</u>, 480 U.S. 1, 4-5 (1987) (citing <u>Hanna v. Plumer</u>, 380 U.S. 460 (1965)).   This analysis, first developed in <u>Hanna v. Plumer</u>, "involves a straightforward exercise in statutory interpretation to determine if the statute covers the point in dispute."   <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 26 (1988).  If there is a "direct collision," "[t]he Rule must then be applied if it represents a valid exercise of Congress' rulemaking authority, which originates in the Constitution and has been bestowed on th[e] [Supreme] Court by the Rules Enabling Act, 28 U.S.C. § 2072."  480 U.S. at 5.  Thus, "a district court . . . must apply a federal statute that controls the issue before the court and that represents a valid exercise of Congress' constitutional powers."   <u>Stewart Org., Inc.</u>, 487 U.S. at 27; <u>Exxon Corp. v. Burglin</u>, 42 F.3d 948, 950 (5th Cir. 1995) (<u>citing</u> Wright, Miller & Cooper, 19 <u>Fed. Prac. & Proc.</u> § 4508 (1982)) ("If the [federal] Rule speaks to the point in dispute and is valid, it is controlling, and no regard need be paid to contrary state provisions.").

In determining whether a "direct collision" exists, "the Federal Rules of Civil Procedure are [not] to be narrowly construed in order to avoid a 'direct collision' with state law. The Federal Rules should be given their plain meaning.  If a direct collision with state law arises from that plain meaning, then the analysis developed in <u>Hanna v.</u>

Plumer applies." Walker v. Armco Steel Corp., 446 U.S. 740, 750 n.9 (1980). The "'direct collision' language . . . expresses the requirement that the federal statute be sufficiently broad to cover the point in dispute." Stewart Org., 487 U.S. at 26 n.4.

The constitutional and statutory analysis of a federal rule is fairly straightforward. "The constitutional constraints on the exercise of th[e] rulemaking authority define a test of reasonableness. Rules regulating matters indisputably procedural are a priori constitutional. Rules regulating matters 'which, though falling within the uncertain area between substance and procedure, are rationally capable of classification as either,' also satisfy this constitutional standard." Burlington N., 480 U.S. at 5. Under the Rules Enabling Act, however, "[t]he Federal Rule must not 'abridge, enlarge or modify any substantive right. . . . .' U.S.C. § 2072. The cardinal purpose of Congress in authorizing the development of a uniform and consistent system of rules governing federal practice and procedure suggests that Rules which incidentally affect litigants' substantive rights do not violate this provision if reasonably necessary to maintain the integrity of that system of rules. Moreover, the study and approval given each proposed Rule by the Advisory Committee, the Judicial Conference, and th[e] [Supreme] Court, and the statutory requirement that the Rule be reported to Congress for a period of review before taking effect give the Rules presumptive validity under both the constitutional and statutory constraints." 480 U.S. at 5-6 (internal citations omitted); Hanna, 380 U.S. at 471 ("When a situation is covered by one of the Federal Rules . . . the court has been instructed to apply the Federal Rule, and can refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional

restrictions.").   The burden of "establishing the invalidity of a federal rule is heavy because all federal rules of court enjoy presumptive validity."   Exxon Corp., 42 F.3d at 950.

Consistent with the Hanna analysis, the Court must first determine whether there is a "direct collision" between Rule 23(e) and the Texas Act.  If so, it must then apply Rule 23(e) as long as it is consistent with the Constitution and the Rules Enabling Act. To clarify the legal issue in dispute, the relevant comparison is not between cy pres distributions specifically and the Texas Act, but rather between a court's responsibility under Rule 23(e) to review and approve a proposed settlement agreement (including provisions governing unclaimed settlement funds) and the Texas Act, which directs a holder to deliver unclaimed property to the Texas Comptroller.  If Rule 23(e) controls this initial matter, and provides the court with discretion to approve a plan for the distribution of unclaimed settlement funds that differs from that provided under Texas law, that is the end of the inquiry – the unclaimed funds must be distributed in the manner provided in the approved settlement agreement, whether it be in the form of attorney's fees, reversion to the defendants, or, as in this case, via another method chosen by the Court in its discretion.

> **2.      There is a Direct Collision between Rule 23(e) and the Texas Unclaimed Property Act**

To determine whether there is a "direct collision" between Rule 23(e) and the Texas Act, the Court begins by considering the purpose of Rule 23(e) and the Court's role in approving class action settlements.   It then examines whether this role extends to the approval of plans for the distribution of unclaimed settlement funds.

### a.       The Role of the Court in Class Action Settlements

Rule 23(e) of the Federal Rules of Civil Procedure provides the guidelines for a court's analysis of a proposed class action settlement.   The rule provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. . . .   If the propos[ed] [settlement] would bind class members, **the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate**."  Fed. R. Civ. P. 23(e)(2) (emphasis added). The purpose of Rule 23(e) is "to protect the nonparty members of the class from unjust or unfair settlements affecting their rights."  Wilson v. Southwest Airlines, Inc., 880 F.2d 807, 818 (5th Cir. 1989).  Court approval is required to "protect the rights of absent class members whose interests may be compromised by the settlement."  Ibarra v. Texas Employment Comm'n, 823 F.2d 873, 878 (5th Cir. 1987).   As the Fifth Circuit has explained, "[t]he Federal Rules of Civil Procedure require that the court approve the settlement before the action is dismissed or compromised . . . and careful scrutiny is necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members or shareholders.  **The court's role as a fiduciary serving as guardian for the unrepresented class members has been held to stem directly from the language of the relevant rule**."  U.S. v. City of Miami, Fla., 614 F.2d 1322, 1330-31 (5th Cir. 1981) (emphasis added).   When a court exercises its discretion in deciding on the fairness of a proposed class action settlement, it must "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression. . . . [T]he court acts 'as a fiduciary who must serve as a guardian of the rights of absent class members.'"

DeHoyos v. Allstate Corp., 240 F.R.D. 269, 285-86 (W.D. Tex. 2007) (internal citations omitted); see In re Corrugated Container Antitrust Litig., 643 F.2d 195, 225 (5th Cir. 1981) ("The reason the court is called on to review a settlement is to protect the rights of the many absent class members who were not involved in the negotiations leading to settlement."); see also Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 279-80 (7th Cir. 2002) ("We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries."); In re Cendant Corp. Litig., 264 F.3d 201, 231 (3d Cir. 2001) ("Rule 23(e) sets out the basic charter for a court's analysis of the fairness of a class action settlement. . . .  We have interpreted this rule to require courts to independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished. Under Rule 23(e), the District Court acts as a fiduciary guarding the rights of absent class members and must determine that the proffered settlement is 'fair, reasonable, and adequate.'") (internal citations omitted). The Advisory Committee Notes to Rule 23(e) further reinforce the importance of court oversight of settlements.  The Notes explain, "subdivision (e) is amended to strengthen the process of reviewing proposed class-action settlements. . . .  [C]ourt review and approval are essential to assure adequate representation of class members who have not participated in shaping the settlement."  Adv. Comm. Notes, Federal Rule of Civil Procedure 23(e).

Thus, it is well established that federal courts have considerable responsibilities under Rule 23(e) in the review and approval of proposed class action settlements, and

play a particularly important role in protecting the rights of absent class members.  Courts also have considerable discretion in deciding whether to approve a proposed settlement, based on whether it is "fair, reasonable, and adequate."  The Court next addresses whether this responsibility and discretion extends to all aspects of approving a class action settlement, including plans for the distribution of unclaimed settlement funds, and thus is in direct collision with state law.

> **b.** **Approval of Class Action Settlement Agreements Includes Approval of Provisions Regarding Unclaimed Funds**

Rule 23(e) broadly governs the approval of a proposed settlement and requires court approval of all aspects of a class action settlement, including any provisions governing the distribution of unclaimed settlement funds.  Fed. R. Civ. P. 23(e)(2).  Courts have repeatedly emphasized that when they approve a settlement, they necessarily approve the **entire settlement agreement**, not only certain elements, and exercise their Rule 23(e) oversight responsibility over every provision of a settlement agreement.  See Cotton v. Hinton, 559 F.2d 1326, 1331-32 (5th Cir. 1977) ("We must consider the effect of the **settlement as a whole**. We are not free to delete, modify or substitute certain provisions of the settlement.  **The settlement must stand or fall as a whole**.") (emphasis added); DeHoyos, 240 F.R.D. at 286 ("[T]he court cannot modify the terms of the proposed settlement; rather, the Court must approve or disapprove of the proposed settlement as a whole.").  Like any other provision in a proposed class action settlement, the provisions governing the distribution of unclaimed settlement funds must be "fair, reasonable, and adequate" to obtain court approval under Rule 23(e).  In other words, as a part of the proposed settlement agreement, the provision regarding unclaimed funds must

be subject to the same scrutiny under Rule 23(e) that applies to every other settlement provision.

In this case, the approved settlement agreement provides that, if unclaimed funds exist, "the Settling Parties shall apply to the District Court for directions as to its disposition." (D.E. 136 ¶ 1.56.)  As part of its Rule 23(e) review of the settlement, the Court had the responsibility to review this provision to determine whether it is fair, reasonable, and adequate, and the decision whether to grant approval is within the court's discretion.  Since the unclaimed funds provision in this case left it to the Court to fashion an appropriate distribution, the Court then had further discretion to select the best distribution method.  The Court chose a <u>cy pres</u> distribution, a well established option when dealing with unclaimed funds.

### c. The Court has Discretion to Order a <u>Cy Pres</u> Distribution

The Court has "broad discretionary powers in shaping equitable decrees for distributing unclaimed class action funds."  <u>Six (6) Mexican Workers v. Az. Citrus Growers</u>, 904 F.2d 1301, 1307 (9th Cir. 1990); <u>see</u> <u>Lessard v. City of Allen Park</u>, 470 F. Supp. 2d 781, 782 (E.D. Mich. 2007) (citing <u>Az. Citrus Growers</u>).  As one court explained, "[f]ederal courts rely upon their broad discretionary powers to shape equitable decrees for distributing unclaimed class action funds.  In general, courts have considered four options when faced with unclaimed settlement funds: <u>cy pres</u> distributions; pro rata distribution to class members; escheat of funds to a governmental body; and reversion to the defendant."  <u>In re Linerboard Antitrust Litig.</u>, MDL No. 1261, 2008 WL 4542669, at *3 (E.D. Pa. 2008) (internal citations omitted); <u>In re Folding Carton Antitrust Litig.</u>, 557 F. Supp. 1091, 1105 (N.D. Ill. 1983) (courts "have the power and the responsibility to

exercise equitable discretion to achieve substantial justice in the distribution of the funds"); <u>see also</u> <u>In re Lupron Mktg. and Sales Practices Litig.</u>, MDL No. 1430, 2009 WL 1395411, at *1 (D. Mass. May 19, 2009) (citing <u>In re Folding Carton Antitrust Litig.</u>). This broad discretion "enabl[es] [a judge] to respond fluidly to the varying needs of particular cases." <u>Parker v. Anderson</u>, 667 F.2d 1204, 1209 n.5 (5th Cir. 1982).

In the exercise of their discretion, "[c]ourts have utilized <u>Cy Pres</u> distributions where class members are difficult to identify, or where they change constantly, or where there are unclaimed funds." <u>Masters v. Wilhelmina Model Agency, Inc.</u>, 473 F.3d 423, 436 (2d Cir. 2007) (citing 2 Herbert B. Newberg & Alba Conte, <u>Newberg on Class Actions</u> § 10:16 n.1 (4th ed. 2002)). "**In the class action context, it may be appropriate for a court to use <u>cy pres</u> principles to distribute unclaimed funds**. In such a case, the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated." <u>In re Airline Ticket Com'n Antitrust Litig.</u>, 307 F.3d 679, 682-83 (8th Cir. 2002) (emphasis added).

In practice, federal courts around the nation have ordered <u>cy pres</u> distributions in class action settlements, particularly when unclaimed funds remained. <u>See, e.g.</u>, <u>In Re Publ'n Paper Antitrust Litig.</u>, No. 3:04-md-1631 (SRU), 2009 WL 2351724, at *2-3 (D. Conn. July 30, 2009) ("[W]here settlement funds remain, an award under the <u>Cy Pres</u> doctrine is appropriate to put the remainder to its next best compensation use."); <u>Diamond Chem. Co., Inc. v. Akzo Nobel Chems. B.V.</u>, Nos. 01-2118 (CKK), 02-1018 (CKK), 2007 WL 2007447, at *5 (D.D.C. July 10, 2007) ("The Court shall . . . authorize <u>cy pres</u> distribution of the Remaining Settlement Fund to a newly created endowment

fund at The George Washington University Law School . . . ."); <u>Schwartz v. Dallas</u>
<u>Cowboys Football Club, Ltd.</u>, 362 F. Supp. 2d 574, 577 (E.D. Pa. 2005) (authorizing <u>cy</u>
<u>pres</u> distribution to NFL Youth Education Town Centers of settlement funds in action
regarding bundled NFL programming); <u>In re Motorsports Merch. Antitrust Litig.</u>, 160 F.
Supp. 2d 1392, 1395 (N.D. Ga. 2001) (authorizing <u>cy pres</u> distribution to nine charities of
settlement funds in action alleging conspiracy to fix prices on NASCAR race souvenirs).
A leading treatise on class actions likewise recognizes that a court's broad discretionary
power includes the ability to authorize <u>cy pres</u> distributions of unclaimed settlement
funds:

> "courts . . . have arranged for . . . distribution of unclaimed class recovery
> funds for the indirect benefit of the class or for the direct benefit
> prospectively of a group of similarly situated persons which includes a
> major portion of the class as well as nonclass members (<u>cy pres</u> or fluid
> class distributions). . . .  Regardless of the form of distribution, the <u>cy pres</u>
> or fluid recovery distributions serve the objectives of compensation for the
> class (albeit in an indirect manner), access to judicial relief for small
> claims, and deterrence of illegal behavior."

3 <u>Newberg on Class Actions</u> § 10:15 (4th ed.); <u>see also</u> David F. Herr, <u>Annotated Manual</u>
<u>of Complex Litigation</u> § 21.662 ("The disposition of unclaimed funds in class action
settlements . . . continues to be a problem courts and litigants. The uses of the funds are
not unlimited, though courts have wide discretion in dealing with the funds.").[4]

Thus, Rule 23(e) governs the court's approval of all aspects of a proposed class
action settlement, including provisions regarding the disposition of unclaimed settlement
funds.  It is within the court's discretion to approve or disapprove of all aspects of a class

---

[4] During oral argument, the State acknowledged that it did not disagree with <u>cy pres</u> distribution as a concept.  It suggested that <u>cy pres</u> is indeed a reasonable means of dealing with certain property, such as remaining funds below the <u>de minimis</u> amount.  The approximately $4.6 million in unclaimed funds belonging to class members with last known addresses in Texas excludes <u>de minimis</u> amounts.  (D.E. 954-3, Pulliam Aff. ¶ 21; Pulliam Aff. Exh. G.)

action settlement on the basis of whether it is "fair, reasonable, and adequate."  If the approved settlement then leaves the disposition of unclaimed settlement funds to the court, the court has further discretion to shape an appropriate solution, including the ability to authorize a cy pres distribution.

**d.**     **Rule 23(e) is in Direct Collision with the Texas Unclaimed Property Statute**

Having established that Rule 23(e) governs a court's approval of a class action settlement, including proposals for the distribution of unclaimed settlement funds, the Court next considers whether Rule 23(e) is in direct collision with the Texas Act.  As discussed above, under Rule 23(e), the court must decide whether the proposal for distribution of unclaimed settlement funds is "fair, reasonable, and adequate," regardless of whether the provision dictates that the funds, for example, be returned to defendants, be used as additional attorney's fees, or (as in this case) grants the Court further discretion to shape an appropriate remedy, such as a cy pres distribution.  In contrast, the Texas Act provides the court with no discretion.  The Texas Act mandates, inter alia, that all holders of unclaimed property file a report of the property with the Texas Comptroller, and deliver that unclaimed property to the Comptroller.  Tex. Prop. Code §§ 74.101, 301. If the Texas Act applied, the Court would not be able to approve a proposed distribution method that varied from that required by state law, or issue any subsequent order that varied from the requirements of the Texas Act.  Thus, the discretion provided to the district courts under Rule 23(e) in approving the parties' proposal for the distribution of unclaimed settlement funds directly conflicts with the mandatory provisions of the Texas Act.  Courts in other similar contexts have held that when a discretionary federal rule conflicts with a mandatory state law, the two are in direct collision and the federal rule

controls.  For example, in <u>Burlington Northern Railroad Co. v. Woods</u>, the Supreme Court addressed a conflict between Federal Rule of Appellate Procedure 38 (regarding awards of costs in frivolous appeals) and the Alabama affirmance penalty statute, Ala. Code § 12-22-72, which imposes a fixed penalty on appellants who obtain stays of judgment pending unsuccessful appeals.  480 U.S. at 3-4.  The Court held that the federal rule and the state law were in "direct collision," explaining "[Federal] Rule [of Appellate Procedure] 38 affords a court of appeals plenary discretion to assess 'just damages' in order to penalize an appellant who takes a frivolous appeal and to compensate the injured appellee for the delay and added expense of defending the district court's judgment. Thus, **the Rule's discretionary mode of operation unmistakably conflicts with the mandatory provision of Alabama's affirmance penalty statute**."  <u>Burlington</u>, 480 U.S. at 7 (emphasis added).  Other decisions after <u>Burlington Northern</u> have come to a similar conclusion when addressing a conflict between a discretionary federal rule or statute and a mandatory state law.  <u>See, e.g.</u>, <u>Stewart Org.</u>, 487 U.S. at 31 ("Congress has directed that multiple considerations govern transfer within the federal court system, and a state policy focusing on a single concern or a subset of the factors identified in § 1404(a) would defeat that command. Its application would impoverish the flexible and multifaceted analysis that Congress intended to govern motions to transfer within the federal system."); <u>Exxon Corp.</u>, 42 F.3d at 950 (applying reasoning in <u>Burlington</u> in holding that Federal Rule of Appellate Procedure 38 conflicts with the Alaska statute governing attorney's fees on civil appeals); <u>Garza v. Scott and White Mem'l Hosp.</u>, 234 F.R.D. 617, 623 (W.D. Tex. 2005) ("The mandatory sanctions scheme created by [Texas Civil Code] § 74.351 would completely remove the Court's discretion with respect to the

imposition of sanctions for the filing of frivolous claims—discretion with which it is vested under Rule 11 of the Federal Rules of Civil Procedure. **Because it would get in the way of the operation of Rule 11, § 74.351 cannot apply in federal court**.") (emphasis added); Poindexter v. Bonsukan, 145 F. Supp. 2d 800, 806-07 (E.D. Tex. 2001) ("Whereas the federal rules adopt a case-by-case approach to discovery of experts and 'to identifying and deterring frivolous appeals,' [Texas Civil Code] section 13.01 precludes any exercise of discretion within its scope of operation. . . . Section 13.01's mandatory approach, providing a trial court with little discretion, is permissible in state court where the federal rules do not apply. But it cannot apply in federal court."). Thus, because Rule 23(e) prescribes a discretionary mode of operation for approving a class action settlement, including proposals for the distribution of unclaimed funds, and the Texas Act provides a mandatory procedure to be followed when dealing with unclaimed property, the two are in direct collision, and the Federal Rule controls.

The few other courts and commentators to have considered this issue agree with the Court's conclusion.  In Paterson, et al. v. W. Union Fin. Servs., Inc., the district court rejected the same argument Texas makes here, stating, "[u]nder [Rule] 23, this Court has the responsibility to determine whether the settlement proposed by the defendant and class counsel was 'fair, reasonable, and adequate.'  While state law, along with myriad other factors, may influence the Court's opinion on that score, it dictates nothing."  No. 2:01-cv-16 at 4-5 (E.D. Tex. Mar. 14, 2002) (unpublished), aff'd on other grounds, Paterson, 308 F.3d 448.  Commentators have come to a similar conclusion:

> "[s]tate unclaimed property laws are intended to operate as procedural mechanisms to help the owners of unclaimed property reclaim their property.  As such, these laws should be preempted in a federal court class action settlement where the district court has approved under Federal Rule

of Civil Procedure 23 a settlement that includes a provision disposing of
unclaimed settlement proceeds.   Any other result would impermissibly
limit the district court's discretion in determining the proper disposition of
unclaimed settlement funds."

Ethan D. Millar & John L. Coalson, Jr., <u>The Pot of Gold at the End of the Class Action</u>

<u>Lawsuit: Can States Claim it as Unclaimed Property?</u>, 70 U. Pitt. L. Rev. 511, 553

(2009).

### e.      The State's Arguments Must be Rejected

In arriving at its conclusion, the Court notes the unacceptably broad implications

of the State's arguments.   It is simply untenable to conclude, as the State does (D.E. 1091

at 2-4; D.E. 1093 at 2-4), that Rule 23(e) does not apply to the Court's approval of a

procedure for the disposition of unclaimed settlement funds.   The Rule on its face makes

no such distinction, nor does any court decision limit Rule 23(e) in the way the State

suggests.   Moreover, the circuit courts have repeatedly emphasized the importance of

court approval of a class action settlement to protect absent class members.   <u>See</u> <u>supra</u>

Part IV.C.2.a.   This necessarily includes class members who cannot be located to receive

their portion of the settlement.   To suggest that Rule 23(e) does not cover distribution of

unclaimed property is to suggest that those class members who cannot be located are

entitled to less protection than those who can be located, even though court oversight is

specifically meant to protect the rights of those absent class members.   Under the State's

argument, a court reviewing a proposed settlement would have to consider whether each

provision in a proposed agreement – except for the one governing unclaimed settlement

funds – was "fair, reasonable, and adequate."   For the unclaimed funds provision, in

contrast, the court would not be entitled to conduct an extensive review, or an analysis of

the agreement's fairness, reasonableness, or adequacy, but rather would simply have to

defer to the appropriate state unclaimed property law.  A court would be powerless to approve any disposition of those funds other than that provided by state law.  Such a conclusion is irreconcilable with the plain language of Rule 23(e) and its basic rationale. Moreover, if the State is correct, the Court would not only be required to follow the Texas Act, but indeed could be called upon to follow the various procedures described in the abandoned property statute of every state – forty-six states plus the District of Columbia – in which class members who failed to claim their settlement funds were last known to have resided.  Stated differently, the Court's discretion would be constrained not only by one state statute, but potentially by a total of **forty-seven** such statutes.  Such a constraint on the Court's discretion might be more understandable if this were a simple diversity action, where the plaintiffs were Texas citizens suing under Texas law.  This case, however, is a nationwide class action based primarily on federal antitrust law.  State law should not play a significant role in the settlement administration process in this case. Finally, the State's argument, if accepted, may negatively affect the ability of parties to settle future class actions, particularly those in which a significant portion of the settlement fund would go unclaimed.  Not only could reference to numerous unclaimed property statutes increase administration costs, but could in many circumstances constrain the flexibility that parties enjoy in shaping a settlement.  A leading treatise on class actions has explained:

> "In a settlement context, subject to court approval, counsel for the parties have great flexibility in negotiating an agreement concerning how any unclaimed balance of an aggregate class recovery should be distributed. The parties may agree that any surplus funds revert to the defendant, or they may agree that such surplus funds should be distributed in a designated manner to class members who have filed individual claims, or they may agree that the distribution of the surplus funds for the benefit of

the class will be determined by the court or determined by the parties
subject to court approval."

<u>See</u> 3 <u>Newberg on Class Actions</u> § 10:15.  Viewed in this light, Rule 23 must control and

the Texas Act has no application.

### 3. Rule 23(e) is Valid under the Constitution and Rules Enabling Act

As discussed above, once there is a "direct collision" between a Federal Rule and

a state law, the Federal Rule controls "if it represents a valid exercise of Congress'

rulemaking authority, which originates in the Constitution and has been bestowed on the

Court by the Rules Enabling Act . . . ."  480 U.S. at 5.   "The burden of establishing the

invalidity of a federal rule is heavy because all federal rules of court enjoy presumptive

validity."  <u>Exxon Corp.</u>, 42 F.3d at 950.  In this case, the State of Texas does not claim

that Rule 23 is unconstitutional or inconsistent with the Rules Enabling Act.  (D.E. 1093

at 4 n.1.)  Moreover, this Court has already ruled in an earlier Order that Rule 23 is valid

under the Constitution and the Rules Enabling Act.  (D.E. 967 at 30 n.23.)  The Court

therefore need not reconsider this issue here.

\*        \*        \*

In sum, because Rule 23(e) is in direct collision with the Texas Act and is valid

under the Constitution and the Rules Enabling Act, Rule 23(e) controls all issues related

to the distribution of unclaimed settlement funds. The Texas Act does not apply. The

Court has discretion to approve the unclaimed property provision in the parties'

settlement agreement and, consistent with that provision, order a <u>cy pres</u> distribution of

all unclaimed settlement funds.  Although the Court need not do so, it briefly considers

the State's argument that there is no direct collision, and the Texas Act must be applied because it is substantive under the principles first established in <u>Erie</u>.

### D. Even if There is no Direct Collision between State Law and Rule 23(e), State Law Would Not Govern

Even if the Court were to conclude that Rule 23(e) does not govern its approval of plans for the distribution of unclaimed funds in a class action settlement, and rather as the State argues (D.E. 1091 at 5) only a "judicial practice" of granting district courts discretion over the disposition of unclaimed settlement funds conflicts with the Texas Act, the Texas Act would still not apply.  The "broad command of <u>Erie</u>" is that "federal courts are to apply state substantive law and federal procedural law."  <u>Hanna</u>, 380 U.S. at 465.

Where no federal statute or Rule covers the point in dispute (as the State argues here), "the district court . . . proceeds to evaluate whether application of federal judge-made law would disserve the so-called 'twin aims of the <u>Erie</u> rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws.'  If application of federal judge-made law would disserve these two policies, the district court should apply state law."  <u>Stewart Org.</u>, 487 U.S. at 27 n.6 (citing <u>Hanna</u>, 380 U.S. at 468).  The importance of a state law is relevant, "but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court."  <u>Hanna</u>, 380 U.S. at 468 n.9.

1.        **Nature and Purpose of the Texas Unclaimed Property Statute**

Before delving into the <u>Erie</u> analysis, the Court briefly considers the nature and purpose of the Texas Act to provide some context for this discussion.  The Texas Act, like other state unclaimed property statutes, provides a procedure for the return of unclaimed property to its rightful owner.[5]  The Texas Act requires, <u>inter alia</u>, that holders of unclaimed property file a report regarding the property (containing available identifying information) with the Texas Comptroller and deliver that property to the Comptroller, who must attempt to locate the proper owner.  Tex. Prop. Code §§ 74.101, 74.201, 74.301.  In <u>Snell</u>, the court explained, "[t]he Texas Legislature has imposed a specific and detailed procedure for identifying, reporting, and tendering, and has further provided for governmental custody and distribution of unclaimed property. That procedure . . . governs the disposition of certain distributions contemplated in the plan to be made to the . . . class and which may be deemed abandoned at some future date." <u>State v. Snell</u>, 950 S.W.2d 108, 112 (Tex. App.-El Paso, 1997).  The Texas Act thus provides a mechanism "to reunite owners with their property" and does not affect the substantive rights of the absent property owners.  See <u>GSC Enters., Inc. v. Rylander</u>, 85 S.W.3d 469, 472 (Tex. App.-Austin 2002); <u>see also</u> Millar & Coalson, Jr., 70 U. Pitt. L. Rev. at 539-40 ("[S]tate unclaimed property laws are also procedural rather than substantive in nature: after all, they are designed to provide a procedural mechanism to

---

[5] Contrary to the State's argument (D.E. 1091 at 10-11), neither Class Plaintiffs nor the Fifth Circuit has recognized that the Texas Act is substantive.  The Fifth Circuit in <u>Paterson</u> specifically declined to address the issue now before this Court.  308 F.3d at 450-51.  Class Plaintiffs' use of the word "substantive" in reference to the Texas Act during a telephone conference with the Court over three years ago can hardly be taken as recognition that the Texas Act is substantive and in no way "undercuts any claim that it should be considered 'procedural' for <u>Erie</u> purposes."  (D.E. 1091 at 11.)

return missing property to its rightful owner, and are not intended to affect the substantive rights of owners or holders of property.").

### 2.      The "Twin Aims" of <u>Erie</u>

Turning now to the "twin aims" of <u>Erie</u>, discouraging forum shopping and avoiding the inequitable administration of the laws, the Court concludes that, even if Rule 23 were not directly applicable, the disposition of unclaimed settlement funds is a procedural matter governed by federal law.[6]

### a.      Forum Shopping

As the Court has already discussed at length in its previous order (D.E. 967 at 30-31), there is no reason to believe that providing a court with discretion as to the disposition of unclaimed settlement funds would encourage forum shopping. This issue becomes relevant only upon a settlement where funds remain undistributed, an issue that arises only at the end of the litigation process. As the Fifth Circuit has recognized, "[w]ith respect to forum shopping, it is difficult to conceive of a situation in which the availability of the rule would affect the choice to sue in or remove an action to federal

---

[6] The State urges the Court to apply the analysis developed in <u>Byrd v. Blue Ridge Rural Elec. Coop.</u>, 356 U.S. 525, 535-39 (1958), and argues that the Fifth Circuit has applied "a <u>Byrd</u>-type analysis" in considering conflicts between a federal judicial practice and a state rule.  (D.E. 1091 at 5-6.)  Under this analysis, the State argues, the Texas Act prevails.  The Fifth Circuit, however, has been clear that the proper test to apply in this situation is that established in <u>Hanna</u>.  In <u>Mills v. Davis Oil Co.</u>, the Fifth Circuit explained, "**[i]n the absence of a valid Federal Civil Rule addressing the point**, the Court must determine whether a particular rule is procedural or substantive by **considering the 'twin aims of the <u>Erie</u> rule**: discouragement of forum-shopping and avoidance of inequitable administration of the laws.'"  <u>Mills v. Davis Oil Co.</u>, 11 F.3d 1298, 1304 (5th Cir. 1994) (citing <u>Hanna</u>, 360 U.S. at 468) (emphasis added).  Recent Fifth Circuit opinions continue to rely upon the twin aims of <u>Erie</u> to determine whether an issue is substantive or procedural in the absence of an on-point federal rule.  <u>See, e.g.</u>, <u>Hall v. GE Plastic Pac. PTE Ltd.</u>, 327 F.3d 391, 395 (5th Cir. 2003) ("To determine whether an issue is substantive or procedural, this Court must consider the 'twin aims' of <u>Erie</u>: the discouragement of forum shopping and the avoidance of the inequitable administration of the laws.").  The <u>Byrd</u> analysis, while not entirely displaced by <u>Hanna</u>, has generally been discussed, if at all, in the context of the second aim of <u>Erie</u>, avoiding the inequitable administration of the laws.  <u>See</u> <u>Herbert v. Wal-Mart Stores, Inc.</u>, 911 F.2d 1044, 1047-48 (5th Cir. 1990) ("With respect to <u>Erie</u>'s second aim, the rule is not 'bound up with the definition of the rights and obligations of the parties' under state law so that denying the inference would result in different treatment between those parties suing in state court and those suing in federal court on the same cause of action.") (citing <u>Byrd</u>).  The Court explicitly references this standard in its discussion of the second <u>Erie</u> aim, <u>infra</u>.

court, as the party invoking the rule will know only well into the course of the litigation" that the rule will become relevant. <u>Herbert</u>, 911 F.2d at 1047.  It is highly unlikely that class plaintiffs would choose one forum over another based on the rules regarding the disposition of unclaimed settlement funds.  Not only would such an analysis be highly time-consuming and hypothetical, but it is unlikely that these class members would be overly concerned with how unclaimed settlement funds are distributed.  <u>See, e.g.</u>, Millar & Coalson, Jr., 70 U. Pitt. L. Rev. at 545 ("Although a determination that federal law applies to dispositions of unclaimed class action settlement proceeds could theoretically encourage forum shopping if the parties opt to litigate in federal courts to avoid having to take into account state unclaimed property laws during settlement negotiations, such a prospect is dubious at best.").

The State essentially concurs with Class Plaintiffs and this Court that named class members and their counsel would not likely be concerned with rules governing unclaimed property at the time they file suit, and instead claims that the "sole party that has an interest in the unclaimed funds" is the State itself.  The State argues that the Court incorrectly applied <u>Erie</u> by focusing on the interests of plaintiffs rather than the State itself. (D.E. 1091 at 8-9.)   This, however, is the only proper inquiry in the forum shopping analysis.  It is the potential for forum shopping by the plaintiffs that is the relevant <u>Erie</u> consideration, not whether the forum chosen is well suited for an intervenor at the end of the litigation process.  <u>See, e.g.</u>, <u>Ferens v. John Deere Co.</u>, 494 U.S. 516, 527 (1990) ("No interpretation of [28 U.S.C.] § 1404(a), however, will create comparable opportunities for forum shopping by a plaintiff because, even without § 1404(a), a plaintiff already has the option of shopping for a forum with the most favorable law.");

Alcala v. Texas Webb County, 620 F. Supp. 2d 795, 807 (S.D. Tex. 2009) ("With regard to forum-shopping, the question is whether the availability of the state provision would affect the decision of whether to sue in federal court.").  The State's focus on its own interests rather than those of the parties filing suit turns the forum shopping inquiry on its head, and must be rejected.  The Court therefore concludes that application of federal law regarding unclaimed settlement funds would not encourage forum shopping.

### b.        Inequitable Administration of the Laws

It is also highly unlikely that application of federal law would result in "inequitable administration of the laws." Hanna, 380 U.S. at 468.  Although Fifth Circuit case law is limited as to the manner in which this analysis is to be conducted, the court in Herbert considered whether the rule at issue is "'bound up with the definition of the rights and obligations of the parties' under state law so that [not applying state law] would result in different treatment between those parties suing in state court and those suing in federal court on the same cause of action."  Herbert, 911 F.2d at 1047-48 (citing Byrd); see also Alcala, 620 F. Supp. 2d at 807 ("The second aim of Erie looks to whether denial of the state provision in federal court would result in disparate treatment between those parties suing in state court and those suing in federal court on the same cause of action."). Justice Scalia has suggested that "[t]he best explanation of what constitutes inequitable administration of the laws is . . . found in Erie itself: allowing an unfair discrimination between non-citizens and citizens of the forum state. Whether discrimination is unfair in this context largely turns on how important is the matter in question. The decision of an important legal issue should not turn on the accident of

diversity of citizenship, or the presence of a federal question unrelated to that issue." Stewart, 487 U.S. at 40 (Scalia, J., dissenting) (citing Erie, Hanna).

As the Court has discussed in its previous order (D.E. 967 at 31-32), there is no reason to believe that application of the federal rule would result in inequitable administration of the laws.  The issue of unclaimed funds does not relate to a state law claim or defense, or affect the outcome of a case or the relief available.  Rather than result in unfair discrimination between non-citizens and citizens of the forum state, the federal rule promotes uniform treatment for all class members, as all unclaimed funds are dealt with in the same manner – specifically, in a manner that is fair, reasonable, and adequate.  This would not be the case if the Court were forced to apply various state unclaimed property laws.  See D.E. 967 at 32; Millar & Coalson, Jr., 70 U. Pitt. L. Rev. at 546 ("[I]n a nationwide class action, the unclaimed property laws of many states would generally apply.  Because some states clearly exempt class action settlement proceeds, whereas other states would claim these proceeds, the treatment of class members would vary considerably.  A federal rule, by contrast, would promote uniform treatment to all class members.")[7]; id. at 517-27 (discussing the unclaimed property statutes of various states).  Thus, there is no indication that application of federal law would result in inequitable administration of the laws.

---

[7] Many states, including Alabama, Arizona, Arkansas, Kansas, Louisana, Maine, Montana, Nevada, New Jersey, New Mexico, North Carolina, Vermont, and West Virginia, expressly include unclaimed settlement funds within the definition of abandoned property, which must then be turned over to the state revenue agency.  See, e.g., Ariz. Rev. Stat. § 44-302(10)  ("Property that is received by a court as proceeds of a class action and that is not distributed pursuant to the judgment is presumed abandoned one year after the distribution date.");  La. Rev. Stat. Ann. § 154(9) (same);  Me. Rev. Stat. Ann. § 1953(1)(J) (same).  Not every state, however, follows this approach.  For example, California law governing distribution of unpaid residuals in class action litigations directs that payment be made to "nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons, or that promote the law consistent with the objectives and purposes of the underlying cause of action, to child advocacy programs, or to nonprofit organizations providing civil legal services to the indigent."  Cal. Civ. Proc. Code § 384(b).

In sum, even if the State were correct that there is no direct collision between Rule 23(e) and the Texas Act, under the <u>Erie</u> analysis the disposition of unclaimed funds in a class action is properly classified as procedural and governed by federal law.  The disposition of unclaimed funds is a matter within the Court's discretion.

### E.      The Court Need Not Interpret and Apply the Texas Act

Because the Court concludes that Federal Rule of Civil Procedure 23(e), not the Texas Act, governs the distribution of unclaimed settlements, it has no occasion to consider whether the Texas Act in fact requires transfer of the unclaimed settlement funds to the Texas Comptroller, as the parties dispute in their motions.  (D.E. 1090 at 22-24; D.E. 1091 at 11-17; D.E. 1093 at 8-11; D.E. 1095 at 13.)

## V.      Conclusion

For the reasons stated above, Class Plaintiffs' Motion for Summary Judgment is GRANTED.  (D.E. 1090.)  For the same reasons, Intervenor State of Texas's Motion for Final Summary Judgment is DENIED.  (D.E. 1091.)

The funds that have been set aside pursuant to the December 12, 2007 Order of this Court (D.E. 967) shall revert into the Final Unclaimed Fund without further order of this Court.

SIGNED and ORDERED this 22nd day of December, 2009.

_____
Janis Graham Jack
United States District Judge